**In re the Application of Felix BLONDIN, Petitioner,**

v.

**Marthe DUBOIS, Respondent.**

No. 98 CIV. 4274(DC).

United States District Court, S.D. New York.

Jan. 12, 2000.

Valerie S. Wolfman, Sanford Hausler, New York, NY, for Petitioner.

The Legal Aid Society, Federal Defender Division by Leonard F. Joy, New York, NY, for Respondent.

Mary Jo White, United States Attorney for the Southern District of New York by Wendy H. Schwartz, New York, NY, for the United States of America.

## OPINION

CHIN, District Judge.

Petitioner Felix Blondin and respondent Merlyne Marthe Dubois are the parents of Marie–Eline, age 8, and Francois, age 4. In the course of their seven-year relationship, Blondin repeatedly beat and threatened to kill Dubois, often in the presence of their children. Blondin also frequently hit Marie–Eline, and threatened to kill her as well. As a result, in August 1997, Dubois removed the children from their home in France and brought them to the United States, without their father's knowledge or consent. Blondin, a French national, petitioned this Court for the return of his two children to France pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501 (1980) (the "Convention"), and its implementing legislation in the United States, the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq.

By memorandum decision dated August 17, 1998, I denied Blondin's petition, finding by clear and convincing evidence that there was a "grave risk" that the return of the children to France would expose them to "physical or psychological harm or otherwise place [them] in an intolerable situation." Blondin v. Dubois, 19 F.Supp.2d 123, 127–29 (S.D.N.Y.1998) ("Blondin I") (quoting Convention, Art. 13b).

Blondin appealed. While the Second Circuit did not disturb my finding that "returning Marie–Eline and Francois to Blondin's custody ... would expose them to a 'grave risk of harm,'" it concluded that the Convention required "a more complete analysis of the full panoply of arrangements that might allow the children to be returned to the country from which they ... were wrongfully abducted, in order to allow the courts of that nation an opportunity to adjudicate custody." Blondin v. Dubois, 189 F.3d 240, 242 (2d Cir. 1999) ("Blondin II"). In light of this "clarified standard," the Court of Appeals vacated the judgment and remanded the case for further proceedings. The Court of Appeals directed me on remand to consider whether other options were available that would protect the children from the "grave risk" of harm while still honoring "the Convention's mandate to deliver abducted children to the jurisdiction of the courts of their home countr[y]." Id.

Upon remand, I met with the parties and contacted the appropriate French and American authorities to develop a thorough record to aid my analysis of the arrangements by which the children possibly could be returned to France. After receiving responses from the French Central Authority and other French officials, as well as the United States Department of State, I conducted a hearing on December 20, 1999. I heard testimony from a

French lawyer with expertise in French family law and international law, an expert in child psychiatry and child psychology, and Dubois. In addition, I interviewed Marie–Eline and Francois.

After due consideration of all the evidence and the arguments of the parties, I again find by clear and convincing evidence that there is a "grave risk" that the return of the children to France would expose them to "physical or psychological harm or otherwise place [them] in an intolerable situation." Convention, Art. 13b. Recognizing that the "grave risk" exception to the Convention is to be construed narrowly, I find that the extraordinary circumstances of this case require that I apply the Article 13b exception. I find that *any* repatriation arrangements, including even the return of the children in their mother's temporary custody with financial support by Blondin and French social services, would expose Marie–Eline and Francois to a "grave risk" of psychological harm. Accordingly, the petition is denied.

### STATEMENT OF THE CASE

**A. The Facts**

The underlying facts of the case are set forth in my prior decision, *Blondin v. Dubois*, 19 F.Supp.2d 123 (S.D.N.Y.1998), as well as in my September 14, 1998 order denying petitioner's motion for reconsideration; those factual findings are hereby adopted and incorporated in this decision. A brief summary of those facts follows.

Blondin and Dubois, both French citizens, met in 1990 and soon began living together in France. A daughter, Marie–Eline, was born in 1991. Throughout the course of their relationship, Blondin repeatedly abused Dubois, beating her with his hands and a belt, sometimes when she was holding Marie–Eline. In addition, he often threatened to kill Dubois. Blondin also beat Marie–Eline frequently and threatened her life as well; in 1992, Blondin twisted a piece of electrical cord around Marie–Eline's neck and threatened to kill her. *Blondin I*, 19 F.Supp.2d at 124.

To escape the abuse, Dubois twice left Blondin and moved into different battered women's shelters with Marie–Eline and Crispin, her son from a previous relationship. In 1992, Dubois and the children stayed in a shelter for approximately two weeks, returning home when Blondin came to get them. *Blondin I*, 19 F.Supp.2d at 124. In 1993, Dubois and the children left Blondin again, going to another shelter for battered women; Dubois and Marie–Eline eventually moved to a different shelter, where they stayed for approximately eight or nine months. *Id.* at 125.

At some point in 1993, Blondin commenced a proceeding in the French courts to obtain custody of Marie–Eline. In December 1993, the proceedings were resolved when Blondin and Dubois reconciled. The English translation of an October 7, 1997 order of a French court summarized the results of the 1993 proceedings as follows: "parental authority [over Marie–Eline] was granted to both parents jointly, the principal residence of the child being with the father, and the mother having visitation and sheltering rights." *Blondin I*, 19 F.Supp.2d at 125. After the reconciliation, Dubois and Blondin resumed living together, and a son, Francois, was born in 1995.

Despite the reconciliation, Blondin continued to beat Dubois in front of the children. He often threatened to "kill everyone," and once threatened to throw Francois out of the window. In August 1997, Dubois left Blondin again, taking the children to the United States. She removed Marie–Eline and Francois from France without Blondin's knowledge or consent; indeed, she forged his signature to obtain passports for the children. *Blondin I*, 19 F.Supp.2d at 125. Dubois, Marie–Eline, and Francois moved in with Dubois' brother, Aureliou Ruyor, his wife, and their two children in the Bronx.

## B. Procedural History

### 1. The Initial Petition

Within days of discovering that Dubois and the children had left, and apparently unaware that they had fled to the United States, Blondin obtained a preliminary order from a French court, directing that the children not leave the metropolitan area without his permission. Blondin eventually discovered that Dubois, Marie–Eline, and Francois were living in the United States, and on June 18, 1998, he filed a petition in this Court seeking the children's return to France under the Convention.

Following the Convention's mandate to proceed expeditiously, *see* Convention, Art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children."), I conducted hearings in the case on June 19, 22, 24, and 29, 1998. I heard testimony from Blondin, Dubois, and Marie–Eline.

After careful consideration of all of the evidence and the parties' arguments, I found by clear and convincing evidence that there was a "grave risk" that returning the children to France would expose them to physical or psychological harm or otherwise place them in an intolerable situation. *Blondin I*, 19 F.Supp.2d at 124. I found that Blondin had repeatedly physically abused both Dubois and Marie–Eline and had threatened to kill them on numerous occasions, and thus the children would face a "grave risk" of physical and psychological harm at the hands of Blondin if they were repatriated.[1] *Id.* at 124–25. As a result, I held that Dubois had established a defense to Blondin's claim of wrongful removal, and I refused to return the children to France, pursuant to Article 13b of the Convention.

Under these circumstances, I was wary of requiring Dubois and the children to live in Blondin's home. In an earlier ruling from the bench, I had rejected Blondin's suggested alternative custodial arrangement—the temporary placement of the children in France with Marie–Eline's godmother pending a final custody decision by the French courts. (6/29/98 Tr. at 115–16). In my memorandum decision, I considered the further possibility of requiring Blondin to pay for their housing elsewhere, but he represented that he had "no more money." *Blondin I*, 19 F.Supp.2d at 128. In light of all of these considerations, I denied Blondin's petition. Blondin moved for reconsideration of my decision, and I denied the motion by order dated September 14, 1998.

### 2. The Second Circuit's Opinion

Blondin appealed the denial of the petition to the Court of Appeals for the Second Circuit. In a decision dated August 17, 1999, the Second Circuit concluded that I should have performed "a more complete analysis of the full panoply of arrangements that might allow the children to be returned to [France]" to allow the French courts an opportunity to adjudicate custo-

---

1. My finding that Blondin had abused Dubois and Marie–Eline was based not only on Dubois' testimony, but on the testimony of Marie–Eline, as well as medical records that documented the many injuries suffered by Dubois. (*See Blondin I*, 19 F.Supp.2d at 125; 6/29/98 Hearing Def. Ex. D). Although Blondin denied under oath ever having abused Dubois or his children, I remain firmly convinced that he was not telling the truth. His testimony at the June 1998 hearings was incredible. He testified, for example, that he had no idea why Dubois left him in August 1997, when he knew, in fact, that she had left him because of the beatings. *Blondin I*, 19

F.Supp.2d at 128. Furthermore, he stated that Dubois lied about being a battered spouse just so that she could qualify for and live in a battered women's shelter, a completely nonsensical story. *Id.* Blondin also gave shifting testimony as to whether he ever hit Marie–Eline, stating first that he "never" hit her, then that he "very rarely" spanked her, and then that he did not hit her or spank her at all. *Id.* Similarly, Blondin first testified that he "never" hit Dubois, then that he may have slapped her "just in the heat of a dispute," then that "he never slapped her even in the heat of the moment". *Id.* He was obviously lying.

dy, before invoking the Article 13b "grave risk" exception. The Court of Appeals explained that

> [c]ourts considering Hague Convention petitions should make every effort to honor simultaneously the Convention's commitments to the return of wrongfully abducted children (1) to the return of wrongfully abducted children to their home countries, for custody adjudication by courts there ... and (2) to safeguarding the children from "grave risk" of harm.

*Blondin II*, 189 F.3d at 242. The Second Circuit further noted that because the "whole structure of the Convention depend[s] on the institutions of the abducted-to state generally deferring to the forum of the child's home state,"

> it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parent and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation.

*Id.* at 248. In light of this "clarified standard," the Second Circuit vacated the judgment below and remanded the case for further proceedings to consider whether other options were available by which the children could be safely returned to France.

The Court of Appeals stressed, however, that "whatever the outcome of those proceedings might be, we do not disturb the District Court's conclusion that the children should not be released from the United States into the custody of their father. *At most*, they could be returned in the temporary custody of some other person...." *Blondin II*, 189 F.3d at 242 (emphasis added). The Second Circuit again emphasized that it "[did] not disturb or modify the District Court's finding that returning Marie–Eline and Francois to Blondin's custody (either expressly or de facto) would expose them to a 'grave risk' of harm, within the meaning of Article

13(b)." *Id.* at 250. In conclusion, the Court of Appeals directed me to consider on remand "remedies that would allow the children's safety to be protected pending a final adjudication of custody in France." *Id.*

### 3. *Proceedings on Remand*

I proceeded with dispatch after the Second Circuit's decision, discussing the case with the parties informally even before the mandate issued and holding another conference upon receiving the expedited mandate. (9/10/99 Tr. at 1). In addition, in accordance with the Second Circuit's advice to "make any appropriate or necessary inquiries of the government of France," I wrote to the French Ministry of Justice, which acts as the French Central Authority with regard to the Convention, as well as the United States Department of State, seeking its assistance. (*See* 9/14/99 Court Letter to Agnes Bodard–Hermant, *et al.; see also* 10/21/99 Court Letter to Agnes Bodard–Hermant, *et al.*).

By letter dated September 22, 1999, Dubois asked the Court to consider whether Marie–Eline had become so deeply rooted in the United States that returning her to France would expose her to a grave risk of psychological harm, arguing that the Second Circuit had left this issue open to consideration on remand. (*See* 9/22/99 L. Joy Letter to the Court). In an order dated October 28, 1999, I rejected the argument to the extent that respondent was attempting to invoke the "well-settled" exception set forth in Article 12 of the Convention, which applies only when a parent delays for more than a year before filing a petition. (*See* 10/28/99 Order). *See also* Convention, Art. 12; *Blondin II*, 189 F.3d at 247–48. I concluded, however, that the Court of Appeals had not foreclosed the possibility that such an argument could be made within the context of Article 13b of the Convention, and accordingly, I allowed Dubois the opportunity to present evidence on the issue at the scheduled

hearing.[2] (*See* 10/28/99 Order, citing *Blondin II,* 189 F.3d at 247–48).

In November 1999, the United States Attorney for the Southern District of New York, representing the United States Department of State,[3] forwarded to me the responses of the French Ministry of Justice. (*See* 11/24/99 and 12/17/99 W. Schwartz Letters to the Court and enclosures). The United States later submitted a statement of interest, pursuant to 28 U.S.C. § 517,[4] to express its views on the interpretation of the Convention. (*See* 12/17/99 Statement of Interest of the United States).

On December 20, 1999, I conducted an evidentiary hearing at which counsel for the parties and for the United States were present. The United States presented Veronique Chauveau, a French attorney and expert on French and international family law, as a witness. In addition, I heard testimony from Dr. Albert Solnit, Sterling Professor Emeritus of Pediatrics and Psychiatry and Senior Research Scientist at the Yale University Child Study Center, who had examined Marie–Eline and Francois at the respondent's request. Dubois testified about her family's relocation to New Jersey and her relatives in France. Finally, I spoke with Marie–Eline and Francois, on the record but in my chambers, outside the presence of their mother and the attorneys. At the conclusion of the hearing, I reserved decision.

## C. *Additional Findings of Fact*

The government's expert witness, Veronique Chauveau, testified generally about how French custody proceedings operate and about the social and legal support services available to Dubois and the children should they be returned to France. In addition, the letters submitted by the various French authorities in response to my inquiries detailed what specific social services and legal protections awaited Dubois and the children should they return to France.

There is pending in France a court order that granted parental authority over Marie–Eline jointly to Blondin and Dubois, with Marie–Eline's principal residence being with Blondin. (12/20/99 Tr. at 12–13; Chauveau Aff. ¶ 15). Upon arriving in France, Dubois could file a request in French family court seeking a modification of the prior French order to grant her a temporary custody order, fixing the "habitual residence" of the children with her pending the completion of the evaluation and the new custody hearing. (12/20/99 Tr. at 12–13; 11/3/99 B. Biondi Letter to J. Penta). The French family judge would appoint a forensic expert (a child psychiatrist) and a welfare officer to evaluate the children and Dubois and prepare reports to the court. (12/20/99 Tr. at 12; Chauveau Aff. ¶ 15). Chauveau estimated that the entire process of evaluating the children, preparing the reports, conducting a hearing, and rendering a final custody decision could take from one to three months, depending on the diligence of Dubois's attorney, the speed of the forensic expert and the welfare officer, and the willingness of both parties to participate in the inquiry.[5] (*Id.* at 13–14).

2. I also appointed a mediator to try to assist the parties in working out the custody dispute. The mediation was unsuccessful.

3. The Convention provides that each signatory must designate a Central Authority "to discharge the duties which are imposed by the Convention." Convention, Art. 6. The State Department acts as the Central Authority for the United States under the Convention. *See* 53 Fed.Reg. 30637 (1988); *see also* 42 U.S.C. § 11606(a) (the President shall designate a federal agency to serve as the Central Authority).

4. Under 28 U.S.C. § 517, the United States may appear in any court in the United States "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

5. A second court, the juvenile court, would also have jurisdiction over the case if there is an "immediate danger of health, security, ed-

Moreover, Chauveau testified that while French judges "seem to have a difficulty" understanding the meaning of an undertaking, the French courts would likely enforce certain undertakings that Blondin might give, provided that they did not run "contrary to the public policy of France." (*Id.* at 18–19). For example, a French judge would likely enforce an undertaking given by Blondin promising not to enforce the existing custody order until a French family judge ruled on the custody modification request. (*Id.* at 14–15, 19). Blondin has given such an undertaking, as well as others, including offering to pay for the airfare to France for Dubois and the children, as well as three weeks in a "one-star hotel" while Dubois applies for government housing, financial support, and other social services. (*See* 1/12/00 V. Wolfman Letter to the Court & Blondin Undertaking; 10/13/99 V. Wolfman Letter to the Court & 11/3/99 Blondin Hotel Undertaking). Chauveau asserted that these undertakings would likely be enforced as well, for "when there is an agreement between parents that is coherent with the best interests of the child, the judge is always keen to enforce these kind of agreements." (Tr. at 19–20).

In addition, free legal assistance will be provided to Dubois should she return to France. The French Ministry of Justice asked the Seine–Saint–Denis Bar Association in Bobigny, the jurisdiction in which Dubois resided before moving to the United States, to appoint an attorney to represent Dubois in the event she chose to file a custody modification petition. (11/3/99 B. Biondi Letter to J. Penta). In response, the president of the bar association stated that "the Bar Association will appoint an attorney specializing in personal law as a legal representative" for Dubois if she so

requests. (11/2/99 C. Gourion Letter to A. Bodard–Hermant). The appointment of counsel "could occur immediately if Ms. Dubois were to obtain provisional authorization to receive legal aid ... [from] the presiding judge of the court of competent jurisdiction." (*Id.*).

Dubois is also eligible to receive social services and housing from the French government, if she returns to France and applies for such services. (9/8/99 A. Bodard–Hermant Letter to J. Penta). According to Chauveau, Dubois would be eligible for the "minimum revenue," a monthly sum of about 3,000 francs, as well as an "allocation famille locale, which is an allocation every month for the children." (12/20/99 Tr. at 22). The children's allocation would vary, depending on Blondin's financial contribution to their support. (*Id.*). In addition, the French government could contribute some amount of money towards Dubois's rent, or she could apply for residence in a shelter. (*Id.* at 22–24). Dubois could receive these various social services within two or three weeks of applying. (*Id.* at 23).

Finally, the Office of the Public Prosecutor of Bobigny has stated that it will not criminally prosecute Dubois for the abduction of the children, the forgery of Blondin's name on the passport documents, or the use of those forged documents, should Dubois return to France.[6] (11/2/99 Public Prosecutor Statement; Tr. at 16). If Dubois does not return to France with the children, however, the French Ministry of Justice warns that "it might be forced to take action at the level of international mutual assistance in criminal matters" to restore Blondin's parental rights "if no acceptable solution can be found very promptly on the basis of the Hague Convention." (11/3/99 B. Biondi Letter to J. Penta). Chauveau understood this to

---

ucation of a minor child." (12/20/99 Tr. at 10; Chauveau Aff. ¶ 11). The juvenile justice could issue an immediate protective order granting temporary custody to Dubois if there is sufficient evidence of the danger to the children. (12/20 Tr. at 14; Chauveau Aff. ¶ 13).

6. Blondin would still be able to seek damages in a civil suit against Dubois. (11/2/99 Public Prosecutor Statement; Tr. at 16–17).

mean that "we [France] will seek a civil solution as a cooperation based on the Hague. If we don't have any solution, whatever is the solution, based on the Hague, then we leave the criminal procedure on.... [I]f there is no solution by the Hague, they will leave the public prosecutor free." (Tr. at 28).

Chauveau testified that she had discussed the possibility of extradition with someone at the French Ministry of Justice:

Q: In your opinion, what would happen if Ms. Dubois did not come back voluntarily to France? What would happen and what would she face?

A: I believe the public prosecutor would issue an international warrant. I know. I don't believe, I know.

Q: For the purpose of what?

A: Extradition.

[THE COURT]: How do you know that?

A: Because I discussed that with the Ministry of Justice. I don't know if they are going to do it, but this is something they are considering.

(Tr. at 24–25; see also Tr. at 26–30).

In other words, if I decline to send the children back under the Hague Convention and Dubois does not voluntarily return, the French government may seek to extradite Dubois from the United States to pursue a criminal prosecution in France.

Dr. Albert J. Solnit [7] testified about the psychological impact of sending the children back to France for custody proceedings and Marie–Eline's maturity and ability to understand the purpose and meaning of these proceedings. In addition to testifying, Dr. Solnit prepared a written report ("Solnit Report") of his interview with Marie–Eline and Francois. (Resp.Ex. E). Dr. Solnit based his testimony and his report on interviews with Dubois, Marie–Eline, and Francois,[8] as well as my memorandum decision, the Second Circuit's opinion, the October 28th order, and the transcript of the June 29, 1998 hearing. I accept the both the testimony and the written report of Dr. Solnit, and adopt his findings regarding Marie–Eline and Francois.

Dr. Solnit explained that while living in France, Marie–Eline [9] had suffered from an acute, severe traumatic disorder, caused by Blondin's physical and verbal

7. Dr. Solnit is a widely recognized expert in child psychiatry and psychology. His books and articles have been cited hundreds of times in federal and state court cases, including by the Second Circuit in this case as well as the United States Supreme Court. See Bowen v. Gilliard, 483 U.S. 587, 623, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) ("Continuity of relationships, surroundings, and environmental influence are essential for a child's normal development.") (quoting J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child 31–32 (rev. ed.1979)); Blondin II, 189 F.3d at 244 & n. 1, 249 (citing J. Goldstein, A. Solnit, S. Goldstein, & A. Freud, The Best Interest of the Child (1996)). In addition, Dr. Solnit co-authored a textbook on child behavior and development, Problems in Child Behavior and Development (1968), and has written hundreds of articles on child psychology, psychiatry, behavior, development, and education. See Resp. Ex. C (Dr. Solnit's curriculum vitae).

8. Dr. Solnit and his colleague asked to interview Blondin as well, but were unable to arrange a meeting. (See Resp. Ex. E; 12/7/99 L. Joy Letter to V. Wolfman).

9. Dr. Solnit's testimony and report primarily focused on the trauma suffered by Marie–Eline in France. Dr. Solnit explained that clear manifestations of traumatic stress disorder did not emerge in his interview with Francois "because he would probably have been too young to remember it or be able to verbalize it." (12/20/99 Tr. at 59, 71, 93). While Francois might not suffer the same degree of psychological trauma if he were to return to France, I will not separate the children. See In re Rodriguez, 33 F.Supp.2d 456, 462 n. 7 (D.Md.1999); see generally Aristotle P. v. Johnson, 721 F.Supp. 1002, 1005–06 (N.D.Ill.1989) ("[C]hildren['s] relationships with their siblings are the sort of 'intimate human relationships' that are afforded "a substantial measure of sanctuary from unjustified interference by the State.'") (quoting Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).

abuse of her and her mother and the problems of living in an abusive situation. Dr. Solnit identified several manifestations of traumatic stress disorder in Marie–Eline, as described by Dubois and Marie–Eline herself; Marie–Eline had difficulty in eating, nightmares, interrupted sleeping, and fearfulness of being away from her mother. (Solnit Report at 3). *See also Blondin I*, 19 F.Supp.2d at 125.

Since leaving France, however, Marie–Eline and Francois have been living in the "secure environment of their home and extended family" in the United States and in that safe environment, they are recovering from the "sustained, repeated traumatic state created in France by their father's physically and emotionally abusive treatment of their mother and Marie–Eline." (Solnit Report at 4). Marie–Eline told Dr. Solnit that she no longer has nightmares or trouble eating or sleeping. (Solnit Report at 5). Dr. Solnit pointed to Marie–Eline's academic marks at school, which have increased each year she has lived here, as evidence of her "cognitive recovery." (12/20/99 Tr. at 83–84). He stated that while the children have significantly recovered from their traumatic disorders, "[t]hey are not fully recovered yet." (12/20/99 Tr. at 66, 83). In September 1999, Dubois, Marie–Eline, and Francois moved to Woodbridge, a suburb in New Jersey, to live with their uncle, Aureliou Ruyor, their aunt, and their two cousins in a house owned by Ruyor, and Dr. Solnit noted that the children have flourished in this environment. (*See* 12/20/99 Tr. at 64–65, 118,; Solnit Report at 5–6). He explained that Marie–Eline and Francois are "now embedded in an extended family in which you can predict what will happen, they have a good relationship with their cousins, with their aunt and their uncle, and [their aunt and uncle] are extensions of their mother in terms of safety, security, and nurturing." (12/20/99 Tr. at 73).

In Dr. Solnit's clinical judgment, removing the children from this secure environment to return them to France would "al-most certainly" trigger a recurrence of the traumatic stress disorder they suffered in France—i.e., a post-traumatic stress disorder. (Solnit Report at 6). A return to France "would set them back in a very harmful way" in their recovery from their "severe trauma," for "such a move would undo the benefit of the psychological and emotional roots they have established with their mother and her extended family." (Solnit Report at 6–7). Specifically, Dr. Solnit explained that a return to France would confront the children with certain developmental risks, including "not feeling safe," "feeling exposed to the traumatizing uncertainty about where they will live and who will provide them with loving care and safety," and "having their fate determined by strangers." (Solnit Report at 7).

The risk of post-traumatic stress disorder would be present in any proposed arrangement for returning the children to France, "however carefully organized." (Solnit Report at 7). If the children were to return to France and be placed in the custody of a third party, without any contact with Blondin, they would be exposed to a grave risk of psychological harm because "the primary trauma would be removing them from the place where they are beginning to feel safety and trust. . . . [T]he primary trauma is the removal and the uncertainty and the lack of security that comes from leaving where they are now and going back to the scene of their original trauma [France]." (12/20/99 Tr. at 72 & 64–65; Solnit Report at 7).

Even a return in their mother's temporary custody, with the social and legal support and protections detailed by Chauveau and the French Ministry, would not alleviate the risk of post-traumatic stress disorder, "because the removal from where they are now would open up the re[ ]currence of the trauma." (12/20/99 Tr. at 66). Dr. Solnit elaborated on this point:

> [THE COURT]: What I understand you to be saying is that if they have to leave, that in itself would be traumatic.

A: Yes, because they are now embedded in an extended family in which you can predict what will happen, they have a good relationship with their cousins, with their aunt and their uncle, and they are extensions of their mother in terms of safety, security, and nurturing.

(12/20/99 Tr. at 73).

Dr. Solnit further explained that the trauma of removal from this stable environment would be exacerbated by the uncertainty of what would happen in France:

[T]he uncertainty, the insecurity of that transition, the way in which the . . . courts have to march along to an adult sense of time, would magnify that insecurity, that feeling of uncertainty of not knowing where they belonged, who would take care of them, who could assure them of the safety they now feel.

[THE COURT]: One of the problems is you can't say to them, you're going to go back just for a month or three months. Potentially it could be for a longer period of time.

A: Yes. For Francois that would be forever, because his sense of time is not yet that developed. And for Marie–Eline, I think she would not trust that, because there have been other times, as she explained to us, where reconciliation was followed by a continuation of the violence and pain she experienced.

(12/20/99 Tr. at 65; *see also* Solnit Report at 7).

For all of these reasons, Dr. Solnit concluded that any return of the children to France would "almost certainly" trigger a post-traumatic stress disorder "that would impair their physical, emotional, intellectual, and social development," leading to "long-term or even permanent harm to their physical and psychological development." (Solnit Report at 6; *see* 12/20/99 Tr. at 58). The removal of Marie–Eline and Francois from the environment in which they have begun their recovery to return to France "would expose them to physical risks, psychological harm and place them in an intolerable situation." (Solnit Report at 7).

Dr. Solnit also testified as to whether Marie–Eline had "attained an age and maturity at which it is appropriate to take account of her views." Convention, Art. 13b. His written report describes Marie–Eline as "an exceptionally poised . . . 8–year–old third-grade girl who spoke thoughtfully and expressively." (Solnit Report at 5). Dr. Solnit further described her as "a slightly anxious child who glances around and tries to make sure that she knows what is going on around her." (12/20/99 Tr. at 82). He noted that his observations of Marie–Eline were consistent with my earlier description of her as a "bright, articulate, lovely child." (*Id.* at 83; *see* 9/28/99 Tr. at 20). *See also Blondin I*, 19 F.Supp.2d at 128.

In evaluating Marie–Eline's truthfulness, Dr. Solnit explained that Marie–Eline's view could be given "great weight" because her statements emerged spontaneously, in the course of a clinical play situation, rather than during direct questioning. (12/20/99 Tr. at 67). For example, Dr. Solnit testified that Marie–Eline spontaneously told him that her father "had put something around her neck and said he would kill her." (12/20/99 Tr. at 61). In Dr. Solnit's view, the spontaneity of such a statement indicates a "valid impression[ ] that can be given a great deal of weight" rather than a child's attempt to please an adult by giving the "correct" answer to a direct question. (12/20/99 Tr. at 67; Solnit Report at 4–5). While Dr. Solnit conceded that Marie–Eline may have been coached prior to his interview with her, "it seemed as though it was not something that was trained," and he could not detect any rehearsal of her statements. (12/20/99 Tr. at 79–80).

Finally, I spoke with Marie–Eline in my chambers, outside the presence of her fam-

ily and the lawyers.[10] Marie–Eline has continued to adjust well to the United States. She enjoys living in New Jersey with her cousins and aunt and uncle. She is in the third grade at the public school in her town, and reads books every day. (12/20/99 Tr. at 105–6, 112). She remembers "not nice things" about living in France, and explained that she did not want to live with her father "because he is not nice.... [H]e used to spit to my mommy." (*Id.* at 107, 113). She said that she saw her father hit her mother, once with the buckle of a belt. (*Id.* at 114). When asked if her father ever hit her, she answered, "Not really." (*Id.*).

Marie–Eline stated that she "never want[s] to go back to [her] daddy," to live with him or even just to visit him. (*Id.* at 109, 112–115). Even if she did not have to live with her father, she would still only like to visit Paris for one day; she would not want to stay in Paris for a long period of time, because she would miss her cousins and aunt and uncle. (*Id.* at 115).

### DISCUSSION

#### A. The Convention

The Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Convention, Preamble. The Convention is intended to address the situation where parents involved in custody disputes wrongfully take their children across international borders in search of a more sympathetic court. The Convention seeks to do so by restoring the pre-abduction status quo. *See, e.g., Shalit*

v. *Coppe,* 182 F.3d 1124, 1127 (9th Cir. 1999) (quoting *Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 376 (8th Cir.1995)); *Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir.1996); *Blondin I,* 19 F.Supp.2d at 126.

Under the Convention, the court where the petition is brought has jurisdiction to decide the merits of the abduction claim, but not the merits of the underlying custody dispute. Convention, Art. 16, Art. 19; 42 U.S.C. § 11601(b)(4); *Blondin II,* 189 F.3d at 245; *Friedrich,* 78 F.3d at 1063; *Croll v. Croll,* 66 F.Supp.2d 554, 558 (S.D.N.Y.1999). The "abducted-to" court must first determine whether the child has been "wrongfully removed or retained"; the petitioner bears the burden of proof on this issue. 42 U.S.C. § 11603(e)(1)(A). If the petitioner establishes that the removal or retention of the child was wrongful, the child must be returned to the country of his or her habitual residence unless the respondent can establish that one of four narrow exceptions to the Convention applies. *See* Convention, Art. 12, 13, 20; 42 U.S.C. § 11601(a)(4); *Feder v. Evans–Feder,* 63 F.3d 217, 220 (3d Cir.1995); *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir.1995).

■ Dubois concedes that the requirements of the Convention have been met,[11] but she relies on the exception contained in Article 13b, which provides that a court need not return a child to the country where the child normally resides if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13b. A respondent must establish an Art. 13b defense by clear and convincing evidence. *Id.*

10. At Dr. Solnit's suggestion, I spoke with the children in my chambers rather than in the more formal setting of the courtroom. I did not wear my robe and, in a further attempt to put them at ease, I gave the children some toys to play with while we spoke.

11. Both the United States and France are signatories to the Convention. Convention, Art. 1. The children are under sixteen years of

age. *Id.,* Art. 4. They were removed from their habitual residence. *Id.,* Art. 3. The removal was "wrongful" because it occurred without the knowledge or consent of their father, who had joint custody of the children. *Id.* The petition was filed within one year of the wrongful removal of the children. *Id.,* Art. 12; *see Blondin I,* 19 F.Supp. at 126 n. 1.

While the "grave risk" exception must be narrowly construed, see 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed ... are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."), the court must engage in "some evaluation of the people and circumstances awaiting [the] child in the country of ... habitual residence." *Nunez–Escudero*, 58 F.3d at 378; *see also Tahan v. Duquette*, 259 N.J.Super. 328, 335, 613 A.2d 486, 489 (1992) (petitioned court "must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there"). The court must also be mindful that, in drafting Article 13b, the signatories to the Convention were of the view that:

> the interest of the child in not being removed from [his or her] habitual residence without sufficient guarantees of [his or her] stability in the new environment [ ] *gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.*

Elisa Perez–Vera, Explanatory Report to the Convention, ¶ 29 (emphasis added).[12] As one commentator has observed, "[e]ven in some cases of wrongful removal ..., the ordering of a return could be more disastrous to the child than the consequences of allowing the foreign jurisdiction to decide the case." Lynda R. Herring, *Taking Away the Pawns: International Parental Abduction & the Hague Convention*, 20 N.C. J. Int'l L. & Com. Reg. 137, 168 (1994) (footnote omitted).

Finally, Article 13 of the Convention provides that:

> [t]he judicial authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views.

Convention, Art. 13.

## B. *Application*

■ I again find, by clear and convincing evidence, that return of Marie–Eline and Francois to France, under any arrangement, would present a "grave risk" that they would be exposed to "physical or psychological harm" or that they would otherwise be placed in an "intolerable situation." I reach that conclusion for three reasons: first, removal of the children from their presently secure environment would interfere with their recovery from the trauma they suffered in France; second, returning them to France, where they would encounter the uncertainties and pressures of custody proceedings, would cause them psychological harm; and third, Marie–Eline objects to being returned to France. I will discuss each of these reasons in detail, and I will also address certain arguments raised by Blondin, the United States, and France.[13]

---

**12.** Perez–Vera was the official Hague Conference reporter for the Convention, and the United States Department of State explains that "[h]er explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." 51 Fed.Reg. 10494, 10503 (1986) (U.S. Dept. of State Text and Legal Analysis of the Convention).

**13.** I held in my October 28, 1999 order that the parties could present evidence and arguments on the question of whether the children are be so "deeply rooted" in the United States that "there is a grave risk that [the] child's return would expose the child to ... psychological harm," thus excepting the child from return under Article 13b, even though a petition seeking the child's return was filed within a year of the child's abduction. The United States and Blondin argue that construing the "grave risk" exception in such a manner would undermine the one year provision and would encourage respondent parents to delay proceedings so they could argue the children had become "deeply rooted." I do not reach this issue, in light of my finding that the Article 13b "grave risk" exception applies. My determination is not based on a conclusion that the children have become so "deeply rooted" that they ought not to be returned. Rather, my decision is based on the "grave

### 1. *Removal of the Children from their Present Environment*

I accept and give great weight to Dr. Solnit's expert opinion that removing the children from the secure environment in which they now live to return them to the scene of their original trauma would expose them to a "grave risk" of harm, in view of the history of the serious abuse they suffered at the hands of their father. I am convinced that wrenching the children away from the safe, extended-family environment in which they have begun to recover from the trauma caused by their father's abuse would thwart their recovery by causing a recurrence of the traumatic stress disorder they suffered in France. *Any* return of Marie–Eline and Francois to France, the site of their father's sustained, violent abuse, including even a temporary one-to-three month return in the custody of their mother, would trigger this post-traumatic stress disorder.

Dr. Solnit concluded that any return of the children to France, "however carefully organized," would disrupt their recovery and "almost certainly" trigger a recurrence of their traumatic stress disorder, because the children would be uprooted from the safe environment and "secure emotional relationship-base" that has nurtured them here in the United States. A recurrence of the traumatic stress disorder would impair the children's physical, emotional, intellectual, and social development, and "almost certainly lead to long-term or permanent harm to their physical and psychological development." I accept and agree with Dr. Solnit's conclusions, and I find that the removal of the children from their present environment, even temporarily, will expose them to a grave risk of physical and psychological harm.

In a similar factual situation, a district court denied a Convention petition on the basis that returning three children to the place in which they were abused would frustrate their recovery from a post-traumatic stress disorder that was caused by

their father's abuse. *See In re Rodriguez,* 33 F.Supp.2d 456 (D.Md.1999). The petitioner father in *Rodriguez* physically assaulted his son and wife about twice a month and routinely demeaned them with verbal insults and name-calling; this physical and emotional abuse frequently occurred in front of one of the couple's other children. *Id.* at 459–460. At the hearing on the petition, a psychologist who had examined the children testified that they suffered from post-traumatic stress disorder as a result of their father's conduct, manifested by difficulty in eating and sleep disorders. The psychologist concluded that

> the children's only hope of recovery from [post-traumatic stress disorder] is to be placed in a secure environment. *Returning the children to [the country where they were abused], even if it did not result in the children's physical abuse at the hands of their father, would result in psychological trauma because of the children's fear of physical harm, a fear well grounded in their experience.*

*Rodriguez,* 33 F.Supp.2d at 461 (emphasis added).

### 2. *Return of the Children to the Uncertainties of the Custody Proceedings*

I also agree with Dr. Solnit's conclusion that the insecurity of the transition to France and the uncertainties surrounding the custody proceedings there would exacerbate the trauma suffered by Marie–Eline and Francois should they be returned. If I return the children to France, they will be uprooted from their stable, predictable family setting and thrown into a maelstrom of uncertainty and insecurity. The children would have only temporary living arrangements in a hotel upon their arrival in France; after three weeks, they would have to move out of the hotel, and it is unclear exactly where they will live after that. To some extent, they would essen-

---

risk" exception, as explained below, and the

totality of the circumstances.

tially become wards of the state, dependent on public assistance. It is also unclear how long the custody proceedings would last; Chauveau testified that they could take anywhere from one to three months. As Dr. Solnit explained, to children who do not "march along to an adult sense of time," three months could seem eternal.

Moreover, the custody proceedings themselves will expose the children to extreme uncertainty about where they will live and who will take care of them, as well as the insecurity of having their fate decided by strangers. I could not assure that they would remain in their mother's temporary custody pending the proceedings as there is a French order in force, directing that Marie–Eline's principal residence is with Blondin. Admittedly, a certain degree of uncertainty attends any custody proceeding, but in this case, the uncertainty associated with the custody proceedings is not an isolated issue; it stands against the backdrop of serious physical abuse by the father, who seeks to gain custody of the children. Marie–Eline is particularly sensitive to this insecurity, as there have been several occasions where she has experienced a temporary peace during her parents' reconciliations, only to have it violently interrupted by a recurrence of her father's abuse. In combination, all of the uncertainties associated with a return to France will compound the children's trauma of being removed from their family and returned to the country where they were abused.

### 3. *Marie–Eline's Views*

Although her views are by no means dispositive, Marie–Eline objects to being returned to France, and pursuant to Article 13 of the Convention, I am taking her views into account. *See* Convention, Art. 13 ("The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is ap-

propriate to take account of [his or her] views."). Marie–Eline continues to impress me as a bright, poised, intelligent child who has an understanding of the purpose of these proceedings and who spoke thoughtfully and expressively about her views on being returned to France. Although she is only eight years old, the plain language of Article 13 requires me to consider her maturity as well as her age, and I find that Marie–Eline is a remarkably mature eight-year-old, probably in no small part due to the very adult proceedings and issues that she has been confronted with over the past two years. *Cf. In re Zarate*, No. 96–C–50394, 1996 WL 734613 at *4 (N.D.Ill.Dec. 23, 1996) (noting that there is no specific age at which a child's views should be considered and "[w]hile age is relevant, it must be considered along with the child's degree of maturity").

In her conversations with me, Marie–Eline explicitly stated that she does not want to return to France because she does not want to be subjected to further physical and emotional abuse at the hands of her father. I recognize that Marie–Eline may have been coached to some degree, but I do not believe that her objection to being returned "is the product of the abductor parent's undue influence over the child." 51 Fed.Reg. 10493, 10510 (1986). Although I find that Marie–Eline "has attained an age and degree of maturity at which it is appropriate to take account of her views," and, pursuant to Article 13 of the Convention, could refuse to order her return on this basis alone, I am not relying exclusively or extensively on Marie–Eline's views in deciding not to send the children back. Rather, her objection to being returned to France is simply one of several reasons why I am invoking Article 13(b) and refusing to send the children back.

### 4. *Additional Arguments*

Blondin, France, and the United States make several arguments that I address now.

First, they contend that there are adjustment problems in every abduction case, and that this case does not differ from the usual Convention cases in which the courts declined to apply the Article 13b exception. Here, however, the severity and nature of the trauma that the removal of Marie–Eline and Francois from their home would cause is far worse than the "adjustment problems" that result from the "disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067–1068 (6th Cir.1996). Here, the trauma of uprooting the children from their stable home is compounded and magnified by the fact that they will be returned to the country where they were severely abused, physically and emotionally, by their father for an extended period of time.

Because of the abuse of Dubois and the children, this case differs markedly from other Convention cases in which courts have found that the abducting parent had proven nothing more serious than the "disruption of the usual sense of attachment" and therefore declined to apply the "grave risk" exception. For example, in *Friedrich*, the Sixth Circuit commented on the lack of abuse allegations, noting that the abducting mother "alleg[ed] nothing more than adjustment problems that would attend the relocation of most children. There is no allegation that [the petitioner] has ever abused [the child]." *Friedrich*, 78 F.3d at 1067. *See also, e.g., Rydder*, 49 F.3d at 373 (8th Cir.1995) (psychological harm caused by separating child from primary caretaker is insufficient to establish grave risk exception, without specific evidence of potential harm to children; no allegations of abuse); *Freier v. Freier*, 969 F.Supp. 436, 442 (E.D.Mich.1996) (allegations that separation from mother and siblings would cause severe psychological harm not sufficient to demonstrate grave risk; no allegations of abuse); *Slagenweit v. Slagenweit*, 841 F.Supp. 264, 267 (N.D.Iowa 1993) (while developmentally

disabled child would experience some adjustment difficulties, problems would be temporary and not have long-lasting effect; no allegations of abuse). By contrast, the likely recurrence of the children's traumatic stress disorder, caused by Blondin's abuse, that any return to France will trigger will surely result in long-term or permanent harm, and is not the typical "adjustment problem" that attends the usual Convention return.

Second, Blondin, the United States, and France argue, in essence, that I am reading Article 13b too broadly. Although the Second Circuit did not disturb my findings that Blondin was an abusive parent, it directed me to consider whether other options were available that would protect the children from the "grave risk" of harm while still honoring the Convention's mandate to return abducted children to the jurisdiction of their home country's courts. *Blondin II*, 189 F.3d at 240. This guidance from the Court of Appeals suggests that it is leaning towards the extremely narrow conception of the Article 13b exception set forth by the Sixth Circuit in *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir.1996). The *Friedrich* court stated, in dicta, that a "grave risk of harm" for the purposes of the Convention can exist only in two situations:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich*, 78 F.3d at 1069. In other words, in the Sixth Circuit's view, issues of serious abuse or neglect or extraordinary emotional dependence do not amount to a "grave risk of harm" absent an additional

finding that the court in the abducted-from country is incapable or unwilling to give the child adequate protection.

Similarly, in directing me to consider whether other alternatives were available that would allow the return of the children to France while protecting them from harm, the Second Circuit implied that my findings that Blondin had seriously abused the children were insufficient to establish a "grave risk of harm" under Article 13b without an additional finding that no other options existed by which the children could be safely returned to France.

These interpretations of Article 13b are, in my view, unduly narrow. This case is directly analogous to a factual situation identified by United States Department of State as falling within the "grave risk/intolerable situation" exception:

An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. *If the other parent removes . . . the child to safeguard [him or her] against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.* Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed.Reg. 10494, 10510 (1986) (emphasis added). The State Department did not condition its example on an additional finding that the court in the abducted-from country is incapable or unwilling to protect the child. Although the State Department's illustration refers to sexual abuse rather than physical abuse, there is no reason to conclude that the physical abuse inflicted by Blondin upon Marie–Eline (and upon Dubois, in the presence of the children) is any more tolerable. *See Rodriguez*, 33 F.Supp.2d 456 (denying petition upon finding "grave risk" when father repeatedly beat child).

Under the State Department's interpretation of Article 13b, findings of serious sexual abuse (or physical abuse, by analogy) of the abducted children by a petitioner parent, standing alone, amount to an "intolerable situation" that justifies the invoking of the "grave risk" exception. *See* 51 Fed.Reg. 10494, 10510 (1986). The gloss placed on Article 13b by the Sixth Circuit—and seemingly adopted by the Second Circuit—is unwarranted and narrows the "grave risk" exception to the point where it is virtually written out of the Convention. *See Steffen F. v. Severina P.*, 966 F.Supp. 922, 927–928 (D.Ariz.1997) (implicitly rejecting the Sixth Circuit's interpretation of Article 13b by explaining that the requisite grave risk of harm could be shown by compelling proof that the "unbonding" and "unattachment" that would attend the child's separation from the abducting parent even absent a showing that the abducted-from country's court could not protect the child).

Even if the *Friedrich* interpretation is correct, however, in this case the requisite showing of "grave risk of harm" has been demonstrated by Dubois; I have found that Blondin seriously abused the children, and Dr. Solnit testified that they would suffer severe psychological harm from *any* return to France, no matter how carefully managed by the French courts. I have every confidence that France could protect the children from further physical abuse. What France could not do, if the children were returned, is protect them from the trauma of being separated from their home and family and returned to a place where they were seriously abused, amidst the uncertainties of court proceedings and being on public assistance.

Third, France has communicated its concerns that I am interfering with the pending French order of custody and unduly asserting jurisdiction over a French custody dispute. In exercising my authority under the Convention to apply an exception if I find it to be warranted, I am not making a determination as to the ultimate merits of the custody dispute, nor am I "trying to interfere with [the] French Judge's decision." I am only determining

the merits of the abduction claim under the Convention.

I am concerned by what I perceive to be the attempted intimidation of Dubois and this Court by the French authorities. In a November 3, 1999 letter, the French Ministry of Justice notes that it is carefully watching "the way in which this application is handled and how it is ultimately resolved." (11/3/99 B. Biondi Letter to J. Penta). The French Central Authority then warns that it "might be forced to take action at the level of international mutual assistance in criminal matters" to restore the rights of Marie–Eline and Francois "if no acceptable solution can be found on the basis of the Hague Convention." (*Id.*). France appears to be threatening a criminal prosecution against Dubois to obtain an advantage in this civil dispute. In other words, the French Ministry of Justice is threatening to extradite Dubois from the United States to prosecute her for the abduction of the children if I do not grant Blondin's petition and return the children to France. I am troubled by these veiled threats. The courts, the parents, and the governments of both France and the United States should be motivated by the best interests of the children. Indeed, the drafters of the Convention undoubtedly sought to do what was in the best interests of children.

My decision to deny Blondin's petition does not reflect any lack of trust in the French judicial and administrative systems. Chauveau wondered if I view the French as "undercivilized monkeys or responsible partners to an international convention." (11/4/99 Chauveau Letter to J. Penta). I assure her and the French Central Authority that I view them as the latter. I have every confidence in the ability of the French administrative and judicial systems to protect and support Marie–Eline and Francois pending the adjudication of the custody case. The United States, too, is a "responsible partner to an international convention."

The Convention sets up a framework for analyzing international child abduction cases, and we must work within that framework; I am endeavoring to do precisely that. The Convention provides that if I find that there is grave risk, I need not send the children back. If I decide, as I do, that the children should not be sent back under an exception to the Convention, it is not a matter of American chauvinism, or a lack of trust in the French court system, but a matter of working within the framework of the Convention.

## CONCLUSION

For the foregoing reasons, the petition is dismissed, without costs or fees. The Clerk of the Court is directed to enter judgment accordingly. All memoranda and other materials considered by the court in ruling on this petition are hereby incorporated into and made a part of the record in this action.

SO ORDERED.