**In re the Application of Felix BLONDIN, Petitioner,**

**v.**

**Marthe DUBOIS, Respondent.**

**No. 98 Civ. 4274(DC).**

United States District Court,
S.D. New York.

Aug. 17, 1998.

Valerie S. Wolfman, New York City, for Petitioner.

Leonard F. Joy, Legal Aid Society, New York City, for Respondent.

### MEMORANDUM DECISION

CHIN, District Judge.

Marie–Eline, age 7, and Francois, age 2, are the children of petitioner Felix Blondin and respondent Merlyne Marthe Dubois. Last August, Dubois removed the two children from their home in France and brought them to the United States, without their father's knowledge or consent. Blondin, a French national, petitions this Court for the return of his two children to France pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501 (the "Convention"), and its implementing legislation in the United States, the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA").

I conducted hearings in this case on June 19, 22, 24, and 29, 1998. I heard testimony from Blondin, Dubois, and Marie–Eline. After due consideration of all the evidence and the arguments of the parties, I find by clear and convincing evidence that there is a "grave risk" that return of the children to France would "expose" them to "physical or psychological harm or otherwise place [them] in an intolerable situation." Convention, Art. 13b. Accordingly, the petition is denied. My findings of fact and conclusions of law follow.

### STATEMENT OF THE CASE

#### A. *The Facts*

Dubois, a 44–year old French citizen, met Blondin in the summer of 1990 in Guadaloupe. They were both living in France at the time; Blondin was in Guadaloupe on vacation and Dubois was there to attend her father's funeral. They became intimate and started living together in France, although they did not marry. (6/29/98 Tr. 23–25, 57).

In 1991, Marie–Eline was born in Paris. Blondin and Dubois continued to live together in Paris, with Marie–Eline as well as Dubois's son by a prior relationship, Crispin, who was approximately 16 years old at the time. (*Id.* at 24–25, 31–32). Starting in 1991, Blondin often hit or beat Dubois, sometimes when she was holding Marie–Eline, and often when he had been drinking. (*Id.* at 25–29). As Dubois described the beatings:

> Yes, he would beat me with the child on me sometimes. . . .
>
> He would beat me when the child was on me so she too would get blows. He beat me with the child on me, when I had the child on me.

(*Id.* at 27–28). Marie–Eline confirmed that her father hit her mother, sometimes with a belt (*id.* at 17–18), and she testified that "he spit on my mommy too." (*Id.* at 15). Blondin also screamed at and frequently hit Marie–Eline, sometimes also with a belt. (*Id.* at 11).

At some point in 1992, Blondin took a piece of electrical cord and twisted it around Marie–Eline's neck, threatening to kill her and Dubois. (*Id.* at 28–29). The next day, Dubois left Blondin, taking Marie–Eline and Crispin and moving to a shelter for battered women. (*Id.* at 29). After about two weeks, Blondin came to get them, and they went home with him. (*Id.* at 31).

In 1993, Dubois and Marie–Eline left Blondin again, going to another shelter for battered women, *Structure de Meres et Enfants.* (*Id.* at 32–34). They eventually moved to a different shelter, *Foyer Amitie*, where they stayed for approximately eight or nine months. (*Id.* at 34–35). Because of his age, Crispin was taken to a different shelter for young adults. (*Id.* at 36).

At some point in 1993, Blondin commenced a proceeding in the French courts to obtain custody of Marie–Eline. In December 1993, the proceedings were resolved as Blondin and Dubois reconciled. (*Id.* at 36–39, 41–42). The English translation of an October 7, 1997 order of a French court summarized the results of the 1993 proceedings as follows: "parental authority [over Marie–Eline] was granted to both parents jointly, the principal residence of the child being with the father, and the mother having visiting and sheltering rights." Dubois and Blondin started living together again. (*Id.* at 42). She became pregnant again, and their son, Francois, was born in August 1995. (*Id.* at 42–43).

Unfortunately, the beatings and threats did not stop. (*Id.* at 42–46, 55–56). In March and June 1995, while she was pregnant, Dubois saw doctors for injuries inflicted by Blondin. In one examination, the doctor found a cutaneous excoriation near her right eye, hematomas on the left arm and forearm, and hematomas on both breasts. The doctor noted that Dubois reported that she had been beaten by her husband on June 21, 1995. On an earlier occasion, a different doctor reported that Dubois complained of being hit in the face by her husband on March 19, 1995. This doctor found localized edema of the lower right maxilla and noted that Dubois complained of headaches. (DX D).

After Francois was born, Blondin continued to beat Dubois in front of the children and he often threatened to "kill everyone." (6/29/98 Tr. 45). Once, he threatened to throw Francois out the window. (*Id.*).

In August 1997, Dubois left Blondin again, taking the children and coming to the United States. She explained why she did this:

Because Felix was worse and worse and worse. He would beat me very often, be angry all the time, always yelling, screaming. The children could not sleep, they were getting nightmares. They would wake up many times at night.

(*Id.* at 49). Dubois took the children and left France without Blondin's knowledge or consent; indeed, she forged his signature to a document to get a passport for the children. (*Id.* at 61–63).

In France, Dubois and the children were supported financially by Blondin. Although Dubois had some funds of her own at some point, those funds are gone. (*Id.* at 67–69). Since August 1997, Dubois and the children have been supported by and living with her family, including her brother, in the Bronx. (*Id.* at 6–10, 22; *see also* 6/24/98 Tr. 27–29).

Marie–Eline has adjusted well to the United States. She is attending public school, including summer school. She speaks English well. (6/29/98 Tr. 9–10). She did not like living in France. She explained why:

[THE COURT]. How did you like living in France?

A. Not good.

Q. Not good?

A. (Shakes head).

Q. Why do you say not good?

A. Because he used to scream, and once I was he hit me up [sic] and because he always hit me. If I don't say what he want me to say, he hit me.

Q. Who is he when you say he?

A. My daddy.

Q. Did he hit you a lot?

A. (Nods).

Q. Yes?

A. (Nods).

(*Id.* at 11). She stated that she does not want to go back to France and that she wants to stay in America. (*Id.* at 17). She explained that she and her mother and brother left France and came to America because "my daddy was too—too trouble for us." (*Id.* at 16). She said that she did not want to return to France because "I don't want my daddy to hit me." (*Id.* at 17).

## B. *Procedural History*

Blondin commenced this proceeding by seeking an ex parte warrant of arrest for the two children, asking the Court to take them into custody pending a determination of the petition. I met with petitioner's counsel ex parte on June 19, 1998, but I was reluctant to issue an ex parte warrant of arrest without speaking to petitioner himself. (6/19/98 Tr. 16–20). On June 22, 1998, Blondin appeared, with his attorney. I conducted an ex parte hearing and Blondin testified as to why he believed an ex parte warrant of arrest was required. I was not persuaded that a basis existed for issuing an ex parte warrant, which would have involved directing the U.S. Marshal to arrest the two children, without any prior warning or notice to their mother. Accordingly, I denied the application for an arrest warrant and instead issued an order to show cause returnable two days later, on June 24th. (6/22/98 Tr. 19–21).

Dubois was served with the order to show cause, albeit not in a timely fashion. (6/24/98 Tr. 2–10). She nonetheless appeared as ordered on June 24th, and I appointed counsel to represent her. On June 29th, I conducted an evidentiary hearing, and both Dubois and Blondin testified. I also spoke with Marie–Eline, on the record but in the robing room, outside the presence of her parents and their attorneys. At the conclusion of the hearing, I reserved decision.

## *DISCUSSION*

### A. *The Convention*

 The Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Convention, Preamble. The Convention is intended to address the situation where parents involved in custody disputes wrongfully take their children across international borders in

search of a more sympathetic court. *See Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996); *Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 376 (8th Cir.1995). The Convention seeks to "restore the pre-abduction status quo" by providing for the return of the children to the country of their "habitual residence" for resolution of the merits of the custody dispute; the court in the "abducted-to nation" has jurisdiction only to decide the merits of the "abduction claim." *Friedrich,* 78 F.3d at 1063–64; *see also Nunez–Escudero,* 58 F.3d at 376.

The Convention sets certain requirements that must be met before a petition for the return of a child may be granted. Dubois concedes that the requirements of the Convention have been met,[1] but she seeks to invoke Article 13b of the Convention, which provides that a court need not return a child to the country where the child normally resides if

> there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Convention, Art. 13b. A respondent seeking to invoke Article 13b must prove by clear and convincing evidence that the exception applies. ICARA § 4(e)(2)(A), 42 U.S.C. § 11603(e)(2)(A). Hence, the issue presented in this case is whether Dubois has demonstrated, by clear and convincing evidence, that there is a "grave risk" that returning the children to France would expose them to "physical or psychological harm or otherwise place [them] in an intolerable situation."

 The "grave risk" exception must be narrowly construed. *See* ICARA § 2(a)(4), 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed ... are to be promptly returned unless one of the *narrow* exceptions ... applies.") (emphasis added); Stephanie Vullo, *The Hague Convention on the Civil Aspects of International Child Abduction: Commencing a Proceeding in New York for*

---

1. Both the United States and France are signatories to the Convention. The children are under sixteen years of age. They were removed from their place of habitual residence. This removal was "wrongful" because it occurred without the knowledge or consent of their father, who had

joint custody of the children. The petition was filed within one year of the wrongful removal of the children. Convention, Arts. 3, 4, 12; *see generally Brooke v. Willis,* 907 F.Supp. 57, 60 (S.D.N.Y.1995).

*the Return of a Child Abducted from a Foreign Nation,* 14 Touro L.Rev. 199, 288–29 (1997). In deciding whether to apply the "grave risk" exception, the court is neither adjudicating the merits of the underlying custody dispute nor deciding which parent is more deserving of custody. Rather, the court's inquiry must be narrowly focused on whether returning the child would present a "grave risk" of physical or psychological harm or an intolerable situation.

In making even this narrow inquiry, however, the court must engage in "some evaluation of the people and circumstances awaiting [the] child in the country of . . . habitual residence." *Nunez–Escudero v. Tice–Menley,* 58 F.3d at 378; *see also Rydder v. Rydder,* 49 F.3d 369, 373 (8th Cir.1995) (noting that district court took into account fact that both parents were "intelligent, mature, loving parents"); *Panazatou v. Pantazatos,* No. FA 960713571S, 1997 WL 614519, at \*2–3 (Conn.Super.Ct. Sept.24, 1997) (considering parent's financial resources and ability to provide support); *cf. Tahan v. Duquette,* 259 N.J.Super. 328, 613 A.2d 486, 489 (N.J.Super.Ct.App.Div.1992) (court in petitioned jurisdiction "must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there," but "[w]ithout engaging in an exploration of psychological makeups, ultimate determinations of parenting qualities, or the impact of life experiences"). Moreover, the court must keep in mind that, in drafting Article 13b, the signatories to the Convention were of the view that:

> the interest of the child in not being removed from [his or her] habitual residence without sufficient guarantees of [his or her] stability in the new environment [ ] gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.

Elisa Perez–Vera, Explanatory Report to the Convention, ¶ 29.[2]

Finally, Article 13 of the Convention provides that:

> The judicial . . . authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views.

Convention, Art. 13. The Explanatory Report explains that during the drafting of the Convention,

> all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

Explanatory Report, ¶ 30.

### B. *Application*

■ I find, by clear and convincing evidence, that return of Marie–Eline and Francois to France would present a "grave risk" that they would be exposed to "physical or psychological harm" or that they would otherwise be placed in an "intolerable situation." I reach that conclusion for the following reasons.

First, if the children are returned to France, there is a grave risk that they will be exposed to physical or psychological harm at the hands of Blondin. In the years that he lived with Dubois, he repeatedly beat her, often in the presence of the children. He also beat Marie–Eline. Blondin repeatedly hit Dubois with a belt, spit on her with their daughter watching, and twisted an electrical cord around Marie–Eline's neck. The situation became so intolerable in 1993 that Dubois left Blondin's home with Marie–Eline and Crispin and lived in shelters for almost a year. After a reconciliation, the beatings continued. Blondin beat Dubois even when she was pregnant. The situation deteriorated to the point again in 1997 when Dubois

2. The United States Department of State, which acts as the Central Authority for the United States for purposes of the Convention (*see* Convention, Art. 11), represents that the Perez–Vera report "is recognized by the Hague Conference on Private International Law as the official history and commentary" for the Convention. (Letter from State Dep't to the Court, dated June 18, 1998).

felt she had no choice but to leave France altogether.

Blondin denied under oath ever having abused Dubois or his children, but I am firmly convinced that he was not telling the truth. Indeed, his testimony was incredible. He testified, for example, that he had no idea why Dubois left him in August 1997. (6/22/98 Tr. 17; *see also* 6/29/98 Tr. 79). I was puzzled by this testimony at the time, but it later became apparent that Blondin denied any such knowledge because he knew, in fact, that she had left him because of the beatings. His testimony with respect to the events of 1993 was equally nonsensical. Again in an effort to deny that he abused Dubois, he stated that Dubois lied about being a battered spouse in 1993 just so that she could qualify for and live in a center for battered women. (6/29/98 Tr. 77–78). Of course, it makes no sense that anyone would concoct a story and pretend to be a battered spouse to qualify to live in a shelter for battered women.

In addition, Blondin gave shifting testimony as to whether he ever hit Marie–Eline or Dubois. He testified first that he "never" hit Marie–Eline, then that he "might have given her a slap on the behind," then that he "very rarely" spanked Marie–Eline, and then that he did not hit or spank her at all. (*Id.* at 74). Likewise, he testified first that he "never" hit Dubois, then that he may have slapped her "just in the heat of a dispute," then that he never slapped her "in the presence of [the] children," then that he never slapped her outside the presence of the children, and then that he never slapped her even in the heat of the moment. (*Id.* at 74–75).

Blondin also misrepresented or exaggerated facts in seeking relief from this Court. His verified complaint and ex parte petition represented that a French court, "upon hearing argument from both sides, granted joint legal custody to the parties, and physical custody[ ] to the petitioner-father" in 1993. (Compl.¶ 6.1). This allegation implied that the matter was contested and that Dubois had lost, at least in part. In fact, Blondin later conceded that there was a reconciliation and Dubois told the French court she wanted to live with Blondin again. (6/22/98 Tr. 10).

His attorney initially represented in the present proceedings that the French court had made a finding that Dubois had disappeared with the daughter in 1993, when the document actually showed only that Dubois and Blondin separated in 1993. (6/19/98 Tr. 8–9). Blondin first represented to this Court during an ex parte hearing that after Dubois left with Marie–Eline and Crispin in 1993, he found them in a "young wom[e]n's hostel group." (6/22/98 Tr. 9). Later, after Dubois testified, he described it as a "shelter for abused women" and a "center for battered women." (6/29/98 Tr. 77).

Second, Dubois and the children appear to have settled in well in the United States. Less than a year had transpired from the wrongful taking when the petition was filed, but returning the children to France now for custody proceedings would be extremely disruptive. Dubois has no financial resources of her own; she and the children are being supported now by her family, including her brother, here in the United States. In France, Dubois and the children would be dependent on Blondin. Under the circumstances, I would be extremely wary of requiring Dubois and the children to live in his home. Although one possibility would be to require Blondin to pay for their housing elsewhere, he represented to the Court, during discussions about scheduling a hearing, that he had "no more money" and could not afford the cost even of airfare to come back to the United States. (6/24/98 Tr. 21–24). Indeed, he represented to the Court that he had to take out a loan to pay for his expenses to come to the United States in the first place. (*Id.* at 24). Under these circumstances, requiring Dubois and the children to return to France for legal proceedings would present a grave risk of psychological harm or an intolerable situation.

Third, although it is by no means dispositive, Marie–Eline has expressed her desire not to return to France. She is only seven years old, and I have no doubt that she was prepared, to a degree, for her appearance before me. Nonetheless, I believe she was being truthful, and she does appear to be a bright, articulate young person. While her preference, by itself, certainly would not be a

basis for not returning her to France, it is a factor that I may take into account. *Cf. Daniel H. v. Catherine Ann O.H.*, N.Y.L.J., p. 32, col. 1 (Fam. Ct. Monroe County Oct. 17, 1996) (concluding that 7–year old lacked "the maturity and ability to form a rational judgment," but nonetheless noting child's views). Marie–Eline's testimony—that she and her mother left France and came to America because "my daddy was ... too trouble for us" and that she did not want to return to France because "I don't want my daddy to hit me" (6/29/98 Tr. 16, 17)—is compelling.

The Convention recognizes that custody decisions should be made in the country of habitual residence and it seeks to deter parents from wrongfully taking their children across international borders. It therefore grants certain rights and privileges to a parent who has been victimized by the unilateral actions of the other parent. Here, however, Blondin is not the victim. Rather, he created his own predicament by abusing and victimizing Dubois and the children. His rights under the Convention therefore must give way to the "primary interest" of the children not to be exposed to "physical or psychological danger" or the "intolerable situation" that would surely exist if they are returned to France. Explanatory Report, ¶ 29. Accordingly, pursuant to Article 13b of the Convention, I decline to order the return of the children to France.

### CONCLUSION

For the foregoing reasons, the petition is dismissed, without costs or fees. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.