Mattityahu ELYASHIV, Petitioner,

v.

Iris ELYASHIV, Respondent.

No. 03–CV–1491(FB).

United States District Court, E.D. New York.

Jan. 26, 2005.

Leo Gagion, Kristopher Dawes, Corinne
Levy, Eva Wolaniuk, Dewey Ballantine,
LLP, New York, NY, for the Petitioner.

Claudia L. Hammerman, Robyn F. Tar-
nofsky, Adam Z. Heilman, Bairbre O'Neill,
Paul, Weiss, Rifkind, Wharton & Garrison,
LLP, New York, NY, for the Respondent.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Pursuant to the Hague Convention on
the Civil Aspects of International Child
Abduction, Oct. 24, 1980, T.I.A.S. No.
11670, 1343 U.N.T.S. 89, *reprinted in* 51
Fed.Reg. 10,494 (Mar. 26, 1986) (Conven-
tion), implemented by the International
Child Abduction Remedies Act (ICARA),

42 U.S.C. § 11601 et seq. (2000), petitioner, Matityahu Elyashiv (Mr. Elyashiv), filed a petition against his wife, respondent, Iris Elyashiv (Ms. Elyashiv), seeking the return to Israel of their three children, who are currently residing with their mother in the United States.[1] Ms. Elyashiv opposes the petition, arguing that (1) returning the children to Israel would pose a grave risk of physical or psychological harm, and (2) the children, having attained a sufficient age and degree of maturity, object to their return. The petition is denied.

## THE EVIDENTIARY RECORD

■ The Court held a hearing that commenced June 21, 2004.[2] Ms. Elyashiv and Dr. Stephanie Brandt (Dr. Brandt), a child psychiatrist retained by Ms. Elyashiv as an expert, testified on Ms. Elyashiv's behalf. Haim Yosef (Mr. Yosef), Ms. Elyashiv's brother-in-law, and Ivon Zadok (Ms. Zadok), Ms. Elyashiv's friend, also testified on her behalf. Mr. Elyashiv, who remained in Israel during the course of the hearing, testified via a video link; no other testimony was presented by the parties.

Prior to the hearing, Dr. Brandt submitted two reports, dated April 7, 2003 (Expert Report # 1) and April 13, 2004 (Expert Report # 2), based on fifteen hours of interviews with Ms. Elyashiv and her three children. Subsequent to the hearing, Dr. Brandt submitted a third report, dated July 23, 2004 (Expert Report # 3), based on a video-link interview with Mr. Elyashiv.

With consent from both parties, on June 28, 2004, the Court interviewed the two oldest children, Ma'ayan (age 14) and David (age 11), *in camera*. To further place the children at ease, in lieu of having a court reporter present, the Court made its own record of the interviews in memorandum format, which it has placed under seal for the children's protection. Since the Court did not create a verbatim record, *see* 28 U.S.C. § 753(b) ("Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim . . . ."), it relies on the interviews only · insofar as they are confirmatory of Ms. Elyashiv and Dr. Brandt's testimony and the Expert Reports, even though the parties did not request that a verbatim record be made. *See Graven v. Graven*, 132 A.D.2d 734, 517 N.Y.S.2d 97, 98 (3rd Dep't 1987) ("[I]n the absence of a request by respondent for Family Court to record an in camera interview between it and the child, we reject respondent's argument on appeal that we must reverse because no record of the interview was made." (citations omitted)).

At the conclusion of the hearing, the Court permitted Mr. Elyashiv to retain his

1. Ms. Elyashiv removed her children from Israel and brought them to the United States in June 2002. Mr. Elyashiv filed his petition on March 27, 2003, approximately ten months later.

2. Although the issue of the repatriation of children under the Convention should be decided by the Court "as expeditiously as possible," *Blondin v. Dubois*, 189 F.3d 240, 244 (2d Cir.1999) (*Blondin II*), neither party pressed for an expeditious determination; for example, the parties entered into a stipulation on May 27, 2003, two months after the petition was filed, that Ms. Elyashiv's time to file an Answer would be extended "pending a determination by [Mr. Elyashiv] as to whether an Amended Petition would be filed"; the Court was not notified until November 7, 2003, that no Amended Petition would be filed, *see* Stipulation (Nov. 7, 2003); and the pleadings were not finalized until January 20, 2004, with the filing of an Amended Answer; moreover, it was not until July 23, 2004 that Mr. Elyashiv advised the Court that he would rest his case without submitting an expert report. *See* Letter from Corinne D. Levy (July 23, 2004), at 1.

own expert. *See* Tr. at 280.[3] After Mr. Elyashiv informed the Court on July 23, 2004 that he would rest his case without submitting an expert report, *see supra* note 2, the Court received a letter from counsel for Ms. Elyashiv that informed the Court that Dr. Brandt had received an unsolicited letter, dated July 22, 2004, from Dr. Michael Stone (Dr. Stone), an expert who had been retained by Mr. Elyashiv, and requested its admission into evidence. *See* Letter from Adam Z. Heilman (July 30, 2004), at 1. Dr. Stone's letter, which was submitted to the Court in a subsequent letter from Ms. Elyashiv's counsel, explained that after interviewing Mr. Elyashiv, Ms. Elyashiv and the children, he "came to the same conclusion as [Dr. Brandt] did[,]" and then reiterated Dr. Brandt's conclusions. *See* Letter from Dr. Stone to Dr. Brandt, attached to Letter from Bairbre E. O'Neill (Aug. 3, 2004). Dr. Stone also explained that after he informed counsel for Mr. Elyashiv of his conclusion, he was "told ... not to write up [his] report [and] essentially [was] tak[en] off the case." *Id.*

■ Mr. Elyashiv contends that the letter is not admissible because it is derived in part from communications protected by attorney-client privilege, it qualifies as opinion work-product, and its potential for unfair prejudice substantially outweighs its probative value. *See* Letter from Corinne D. Levy (Aug. 16, 2004). The Court need not address the first two issues because the prejudicial nature of the letter substantially outweighs its probative value; hence, the letter is not admissible under Federal Rule of Evidence 403. *See* Charles A. Wright, Arthur R. Miller & Richard L. Marcus, 8 Federal Practice and Procedure: Civil § 2032 (2d ed. 1994) ("[T]he views of [an] expert may be afforded unique weight exactly because he or she

was initially retained by the side against which the testimony is offered."). *See also Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458, 460 (S.D.N.Y.1995) ("[P]ermitting one party to call an expert previously retained or consulted by the other side entails a risk of very substantial prejudice stemming from the fact of the prior retention, quite apart from the substance of the testimony."); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 246 (N.D.Iowa 1996) (same). Any probative value that may be ascribed to the letter is undermined because it is wholly cumulative of Dr. Brandt's testimony. *Compare Rubel*, 160 F.R.D. at 460–61 (excluding testimony of opposing party's non-testifying expert because it "appear[ed] to be cumulative save, of course, for the fact that [the expert] was retained in the first instance by the [opposing side]."), *with House*, 168 F.R.D. at 236 (admitting testimony of opposing party's non-testifying expert because it was non-cumulative).

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

#### 1. Credibility Determinations

The Court credits Dr. Brandt's testimony and her reports. Her testimony was clearly articulated and well-reasoned, and her credentials are impeccable. Moreover, Mr. Elyashiv neither presented his own expert to controvert her testimony nor effectively undermined her qualifications or findings through cross examination.

The Court also credits Ms. Elyashiv's testimony. In particular, the Court finds that Ms. Elyashiv's affect was consistent with Dr. Brandt's opinion that Ms. Elyash-

---

**3.** "Tr." refers to the hearing transcript.

iv was the subject of "severe domestic violence[.]" Expert Report # 1 at 11. Moreover, Ms. Elyashiv's testimony in all relevant respects was confirmed by Ma'ayan and David's interviews with Dr. Brandt, as set forth in her reports, and by the Court during its interviews with the children. In regard to Dr. Brandt's interviews, she observed:

> [The children] speak in terms that are graphic and nuanced. This could not be produced by children as an act, or even as an exaggeration. It would require the sophistication and talent of an entire family of highly skilled actors. Even then, their reports would have a stilted, choreographed quality and be inconsistent.

*Id.* In her follow-up report, Dr. Brandt reiterated that "the children's impressions and responses lacked any sign of being contrived, choreographed or inconsistent." Expert Report # 2 at 9.

The Court also credits the testimony of Mr. Yosef and Ms. Zadok, although the latter's was not particularly probative.

By contrast, the Court does not credit Mr. Elyashiv's testimony to the extent that it was controverted by other testimony. Mr. Elyashiv's wholesale denial of any abuse of his wife is simply not credible, and clouds his entire testimony. For example, he admits that he had a long-standing affair during his marriage and that he spent time in jail when accused of rape by his mistress; however, he describes his relationship with his wife as "liv[ing] in wonderful harmony." Tr. at 240.

Mr. Elyashiv's denial of abusing the children is equally suspect. Dr. Brandt, who spent two hours interviewing Mr. Elyashiv, found his "presentation was entirely consistent with those of parents who are chronically abusive." Expert Report # 3 at 1. Moreover, the Court finds Mr. Elyashiv's responses to the questions

posed to him during his testimony about his children to be generally disingenuous. As examples: When asked if he "ever str[uck] David with a belt[,]" he testified that he once used the belt from his robe to strike one of the children "out of need of fun[,]" *see* Tr. at 242; in response to an allegation that David told a teacher that Mr. Elyashiv had hit him, Mr. Elyashiv dismissively blamed the teacher for "exaggerat[ing]." *See id.* at 247.

## 2. The Elyashiv Family

Mr. and Ms. Elyashiv, both Israeli citizens, were married in Israel in 1986, after meeting at a martial-arts class that Mr. Elyashiv instructed. *See id.* at 13. Ms. Elyashiv holds a bachelor's and a master's degree in chemistry, and has completed her course work, although not her thesis, for a doctorate degree. *See id.* at 12. Upon completing her education, Ms. Elyashiv was a chemistry professor at an Israeli university. *See id.* at 13. Mr. Elyashiv earns his living as an instructor of martial arts. *See id.* at 66.

The Elyashivs have three children: In 1990, Ms. Elyashiv gave birth to their first child, Ma'ayan; in 1992, to their second child, David; in 1996, to their third child, Inbar. *See id.* at 14.

## 3. Abuse of Ms. Elyashiv

Throughout their marriage, Mr. Elyashiv verbally and physically abused Ms. Elyashiv; he repeatedly directed ethnic slurs towards her, kicked and hit her. One particularly brutal incident occurred in front of Ma'ayan in 1995, when she was just five years old; Mr. Elyashiv beat Ms. Elyashiv, resulting in bleeding wounds to her nose and eyebrows and bruises on her legs that lingered for over two months. *See id.* at 25–26. The abuse intensified, evolving from kicking and hitting to at-

tempted strangulation, *see id.* at 23; in that latter regard, approximately a month before Ms. Elyashiv left Israel, Mr. Elyashiv placed his hands around her neck, repeatedly shouting, "get out Satan." *Id.* at 23.

Ms. Elyashiv never reported these incidents of abuse to the police because she believed it would be fruitless. *See id.* at 24. She testified: "My husband is a very big person. He's a martial arts trainer. He told me where I go he will find me. He has friends training, policemen and lawyers. It was not a thing I could do.... Even if I did a complaint, he comes back home." *Id.* at 24, 66. Once when she attempted to file a complaint with the police, she encountered one of Mr. Elyashiv's former students; consequently, she left without filing it.[4] *See id.* at 66.

Divorce was not an option.[5] Although Ms. Elyashiv asked Mr. Elyashiv for a divorce within six months of marrying him, *see id.* at 47, Mr. Elyashiv refused and threatened that, if "forced" to do so, "he would kill [her]." *Id.* at 20, 47. In 1996, while Mr. Elyashiv was incarcerated, Ms. Elyashiv had a lawyer prepare divorce papers, but Mr. Elyashiv refused to sign them. *See id.* at 49, 62.

## 4. Abuse of Elyashiv Children

Mr. Elyashiv also physically abused both David and Ma'ayan. Mr. Elyashiv's favor-ite target was David. Apparently disappointed with his only son's physical infirmities, Mr. Elyashiv's abuse originated as verbal disparagement, *see id.* at 27, 34, but evolved to physical abuse. *See, e.g., id.* at 28, 31–34. Ma'ayan also endured abuse by Mr. Elyashiv, commencing when David was born. *See id.* at 33. Inbar, however, was never physically abused by Mr. Elyashiv. *See id.* at 141.

Over time, a pattern developed whereby Mr. Elyashiv routinely used his belt, shoes or hand to hit Ma'ayan and David approximately once or twice a week. *See id.* at 31, 137, 139. Most frequently, the abuse occurred when the children's playing interfered with Mr. Elyashiv's sleep. *See, e.g., id.* at 33. Once, for example, Mr. Elyashiv became so enraged that he placed a pillow over David's face to quiet his crying. *See id.* at 28. When Ms. Elyashiv intervened, Mr. Elyashiv hit her. *See id.* at 28, 33.

Mr. Elyashiv, who harbors three swords and a licensed gun in the home, threatened that "the big sword was to hurt Ma'ayan, and the middle one for David, and the small one is Inbar, and the gun is for [Ms. Elyashiv]." *Id.* at 30. To protect her children, Ms. Elyashiv tried to limit the amount of time the children were exposed to their father; for example, Ms. Elyashiv would deliberately put the children to bed

---

4. It is unclear whether this student was employed at the police station.

5. Apparently "[t]he marital status of Jews in Israel ... comes under the exclusive jurisdiction of the state-funded rabbinical courts. Thus, the marriage or divorce of Jews in Israel is legally required to conform with Jewish law. There is no option for civil marriage or divorce of Jews in Israel.... [A] divorce, or *get,* can only be given by a husband to his wife, not vice versa, and must be done under the auspices of a rabbinical court. The husband must give the *get* voluntarily: a *get* given under duress is voidable." Declaration of Prof. Pinhas Shifman at ¶¶ 10–14, attached to Letter from Robyn F. Tarnofsky (July 23, 2004). *See also* S.I. Strong, *Law and Religion in Israel and Iran: How the Integration of Secular and Spiritual Laws Affects Human Rights and the Potential for Violence,* 19 Mich. J. Int'l L. 109, 155 (1997) ("Israel has made special provision for the inclusion of religious values in [family] law by granting nearly exclusive jurisdiction over these matters to the religious courts pursuant to the Status Quo Agreement.... Israel has four different sets of religious courts, one for each of the officially recognized religions.").

before Mr. Elyashiv arrived home at night. *See id.* at 33.

David once reported an instance of abuse to a teacher at his school. *See id.* at 40. However, upon learning of this, Mr. Elyashiv threatened to kill David. *See id.* at 41. Out of fear of their father, neither David, nor any of the other children, made another report of abuse.

The children also observed Mr. Elyashiv abuse their mother. *See, e.g., id.* at 26. Dr. Brandt testified that children's knowledge of abuse of their mother is "tantamount to being abused themselves. There is a wide-developed well-researched literature that a witness to domestic violence as a child is just as deleterious as if they were themselves the victims." *Id.* at 218.

The effect of Mr. Elyashiv's abuse took its toll on the older children, Ma'ayan and David. Ma'ayan experienced nightmares, and beginning at the age of eight years, started to pull her hair out (later diagnosed as trichotillomania). *See id.* at 37–38. Ma'ayan also endured suicidal ideations while in Israel, and feels severe guilt for not reporting her father's actions. *See* Expert Report # 1 at 6, 11. Not only has Ma'ayan had suicidal ideations, but she also carved out a plan for how she would commit suicide. *See* Tr. at 202.

David's response to his father's abusive behavior was more aggressive and defiant; Ms. Elyashiv testified that he wanted to kill his father. *See id.* at 39. One of his teachers in Israel reported that, although he was usually a gentle boy, the pressure his father placed on him caused him to misbehave when not given what he wanted. *See id.* at 38–39.

Both David and Ma'ayan have been diagnosed with Post–Traumatic Stress Disorder (PTSD). *See id.* at 200, 203–04. Dr. Brandt testified that PTSD is "based on a number of different symptoms." *Id.* at 204.

The first group of symptoms have to do with re-experiencing things so that people who have that disorder have intrusive thoughts, they have recurrent nightmares. They also have something that's like flashbacks. So that they can be in a situation, reminded of something, and they feel like it is happening again. When they are not in that state, they disassociate; they are not very much in control of themselves.... These children have those symptoms. They also have symptoms that involve avoiding thinking about things or avoiding any reference to the traumatic environment so that they are extremely averse to having to talk about it, having to think about it. When they cannot think about it, they try not to. They also avoid any reminder, any place, any activity that's associated with that event. That is not just because they don't like it but it is also because that retriggers all their symptoms and they go into the kind of panic state with all the physiological reactions that occur during the trauma.

*Id.* at 204–05.

### 5. Abuse of Others

Ms. Elyashiv and the children are not the only ones who have been the object of Mr. Elyashiv's abuse. Mr. Elyashiv was found guilty by an Israeli court of assaulting a stranger during a road-rage incident. *See id.* at 52. Even the family dog was not immune from Mr. Elyashiv's rage; in September 2001, after the dog misbehaved, Mr. Elyashiv beat the dog in front of the children, which caused the dog to vomit and significantly upset the children. *See id.* at 37.

### 6. Arrival in United States

In June 2002, Ms. Elyashiv and her three children traveled to the United

States to visit Ms. Elyashiv's sister in Brooklyn. *See id.* at 68. By September 2002, Ms. Elyashiv had decided not to return to Israel and has since lived with her sister. In November 2002, while in the United States, Ms. Elyashiv again tried to obtain an Israeli divorce. *See id.* at 63. However, the Israeli court deferred acting on the divorce papers until this Court ruled on Mr. Elyashiv's petition.[6] *See id.* In December 2002, Ms. Elyashiv obtained an order of protection in Brooklyn Family Court for three years. *See* Resp't's Ex. 3.

Since her arrival in the United States, Mr. Elyashiv has repeatedly threatened Ms. Elyashiv, as well as her family: When Ms. Elyashiv first moved to the United States, Mr. Elyashiv demanded that she return, telling her that he would "break . . . the hands and legs" of her "mother and brother[,]" who live in Israel. *Id.* at 69. In December 2003, Mr. Elyashiv threatened her sister's husband, Mr. Yosef, that he would "do away with [him] if [he] d[id]n't return [the] children home immediately, till [his] last breath." *Id.* at 178. Ms. Elyashiv's sister changed her telephone number twice in an attempt to end harassing phone calls from Mr. Elyashiv. *See id.* at 77.

### 7. Children's Assimilation

In the United States, Ma'ayan and David were both elected class presidents. *See* Expert Report #2 at 5, 7. Ma'ayan has been accepted to two selective high schools. *See id.* at 1. David and Inbar have learned English despite not knowing a single word prior to their arrival. *See* Tr. at 84. Dr. Brandt opined that "the stability and structure of their environment" have given "David and Inbar[ ]

peace of mind[.]" Expert Report #1 at 13.

Ma'ayan's trichotillomania ceased shortly after arriving in the United States. *See* Tr. at 37–38. Both David and Ma'ayan are now in the recovery stage of PTSD and have made significant progress over the past year. *See id.* at 206. According to Dr. Brandt, the children's "recovery has been possible because of their feelings of safety and security in their current situation." Expert Report #2 at 9. The children's symptoms recurred when they became aware that this proceeding was impending. *See id.*

### 8. Impact of Returning Children to Israel

If the children were returned and Mr. Elyashiv were ordered by a judicial authority not to abuse or have any contact with them, there is a distinct risk that Mr. Elyshiv would not comply with the order. After interviewing Mr. Elyashiv, Dr. Brandt opined:

> [I]t is quite possible that [Mr. Elyashiv] would refuse to comply with any orders limiting his contact with the children or directing him not to abuse them. . . . [I]t is exceedingly unlikely that Mr. Elyashiv could control or stop himself from reverting to abusive conduct. . . . [H]e would be an extremely poor candidate for any rehabilitative efforts aimed at a healthy rapprochement with the Elyashiv children.

Expert Report #3 at 1.

Moreover, in Dr. Brandt's opinion, although Ma'ayan and David's PTSDs are currently in a recovery stage, if they were returned to Israel—regardless of whether they had contact with Mr. Elyashiv—

---

**6.** It is unclear how the court could grant a divorce without Mr. Elyashiv's consent. *See* *supra* note 5.

"[they] would have a full-blown relapse of their symptoms [of PTSD] which would be extraordinarily disorganizing," and "they would go into very severe panic states." Tr. at 201. Dr. Brandt also opined that their mere *belief* that their return would subject them to unsafe conditions would trigger a relapse. *See id.* at 221–22. Dr. Brandt testified that Ma'ayan, "in all likelihood," would "be suicidal[,]" *id.* at 222, and that if she were returned to Israel, she would need to be placed in a psychiatric hospital and kept under constant surveillance. *See id.* at 222. She further explained that Ma'ayan is "unable to contemplate any return to Israel" and that "[f]aced with that prospect, she can only imagine killing herself." *Id.* In regard to David, Dr. Brandt commented that "he considers the possibility of a return to Israel as life-threatening and has had a severe resurgence of traumatic symptoms as a consequence." *Id.* at 10.

The separation of Inbar from her siblings and mother would likely expose her to psychological harm. Dr. Brandt stated that "[a] separation from her mother and siblings is a completely terrifying notion to [Inbar][,]" Expert Report # 1 at 8, and that Inbar's "greatest fear ... is to be separated from her mother...." Expert Report # 2 at 10.

The Court inquired from Mr. Elyashiv whether any of the children's grandparents could take care of them if they were returned to Israel. *See* Tr. 250–60. He testified that the maternal grandmother lives with her son in just two rooms, *see id.* at 259, in Ramat Gan, only "[t]wo minutes by car" from where he now lives, *see id.* at 251, but he has not spoken to her "during the past two years," *id.;* moreover, "she has twelve grandchildren and she doesn't

see any of them." *Id.* at 270. Ms. Elyashiv testified that "if the children stayed with their grandmother ... [Mr. Elyashiv] would come and threaten [her] mother." *Id.* at 81. According to Mr. Elyashiv, the maternal grandfather lives in the United States, *see id.* at 258; as for his parents, although they also live in Ramat Gan, they had no contact with the children for the five years before the children left Israel because, rather incredulously, his wife "didn't want [him] to have any contacts with [his parents]." *Id.* at 259.

Mr. Elyashiv admitted that he is "facing dire economic circumstances[,]" and that his "house was taken away from him[,]" *id.* at 272; he now "rents an apartment in Ramat Gan." Letter from Corinne Levy (July 28, 2004), at 2.

## CONCLUSIONS OF LAW

### 1. Background

The Convention, to which the United States and Israel are both signatories,[7] endeavors to "protect children internationally from the harmful effects of their wrongful removal ... and to establish procedures to ensure their prompt return...." Convention, pmbl.

[I]n order to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter,* 396 F.3d 124, 130, 2005 WL 17997, at *3 (2d Cir.2005). Once these

---

7. *See* Hague Conference on International Law: Report of the Second Special Commission Meeting to Review the Operation of the

Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

elements are established, "the [Court] shall order the return of the child[,]" Convention art. 12, unless one of the affirmative defenses set forth in Articles 12, 13 and 20 applies.

It is undisputed that in June 2002 the children were habitual residents of Israel and were removed by Ms. Elyashiv in derogation of their father's right to joint custody, which he was then exercising; therefore, in the absence of one of the affirmative defenses, the children must be returned to Israel.

There are five affirmative defenses set forth in the Convention: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment[,]" *id.* art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention,[8] or had consented to or subsequently acquiesced in the removal or retention[,]" *id.* art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" *id.* art. 13(b); (4) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views[,]" *id.* art. 13; and (5) the return of the child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms." *Id.* art. 20.[9]

■ In determining whether an affirmative defense applies, the Court must resist the temptation to engage in a custody determination under the traditional "best interests" test. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("[A] United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." (citing Convention art. 9)). A custody determination would be "contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich*, 983 F.2d at 1400 (citing Convention art. 9 and 42 U.S.C. § 11601(b)(4)). "[I]t is not relevant ... who is the better parent in the long run, or whether the absconding parent had good reason to leave her home ... and terminate her marriage." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000) (citations and quotations omitted).

Ms. Elyashiv has alleged two affirmative defenses: (1) returning the children to Israel would expose them to grave risk of physical or psychological harm, and (2) the children object to their return. The testimony and Dr. Brandt's reports primarily focused on the grave-risk defense.

### 2. Grave–Risk Exception

The Second Circuit has cautioned that the grave-risk exception is a narrow one. A "grave risk" exists in *only* two situations: (1) where returning the child means sending him to "a zone of war, famine, or disease"; or (2) "in cases of *serious* abuse or neglect, or extraordi-

---

8. Since the petitioner must establish that he was exercising custody rights at the time of removal, it is problematical for this to be characterized as an aspect of this affirmative defense.

9. There appears to be a conceptual issue as to whether the objection by a child of sufficient age and maturity to being returned is a separate affirmative defense, as the Court believes, or whether it is somehow of a different status—and hence there are only four true affirmative defenses—as the Second Circuit apparently believes. *See Blondin II*, 189 F.3d at 246 n. 3 ("In addition to these four exceptions, the Convention allows a court to take into account the preference of an older child.").

nary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."

*Blondin v. Dubois,* 238 F.3d 153, 162 (2d Cir.2001) (*Blondin IV*) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir. 1996)) (emphasis added). Only the latter situation, serious abuse, is at issue here.

■ To defeat the "strong presumption of return," *Danaipour v. McLarey,* 286 F.3d 1, 13 (1st Cir.2002), Ms. Elyashiv must prove her grave-risk affirmative defense by "clear and convincing evidence," *see* 42 U.S.C. § 11603(e)(2); however, "subsidiary facts . . . need only be proven by a preponderance of the evidence." *Danaipour v. McLarey,* 183 F.Supp.2d 311, 315 (D.Mass.2002) ("there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence" (citations omitted)), *rev'd on other grounds,* 286 F.3d 1, 13 (1st Cir.2002) ("The district court held that subsidiary facts must be proved by a preponderance of the evidence, a standard we accept.").[10]

## A. *Blondin v. Dubois*

*Blondin v. Dubois,* the only Second Circuit case addressing the grave-risk exception, factually resembles this case and analytically guides the Court. The district court found by clear and convincing evidence that returning a father's two children to France, their home country, "would present a 'grave risk' that they would be exposed to 'physical or psychological harm' or that they would otherwise be placed in an 'intolerable situation.'" *Blondin v. Dubois,* 19 F.Supp.2d 123, 127 (S.D.N.Y.1998) (*Blondin I*). It supported this conclusion because: (1) the children would be "exposed to physical or psychological harm" by their father, who had "repeatedly beat[en] [his wife], often in the presence of the children[,]" and had beaten the older child, *id.*; (2) the children "have settled in well in the United States," *id.* at 128; and (3) although "by no means dispositive," the older child "expressed her desire not to return" to France, a factor which the court believed "it could take into account." *Id.*

In addition, the court briefly considered whether the children could be housed other than in their father's home if they were to be returned to France for custody proceedings since, "[u]nder the circumstances," it "would be extremely wary of requiring [the mother] and the children to live in [the father's] home." *Id.* The court determined that, given the mother's lack of financial resources, she and the children would be financially dependent on the father for housing outside of the home, which was not a viable option in light of the father's contention that he had "no more money." *Id.*

On appeal, the Second Circuit agreed with the district court's grave-risk finding,

10. The defenses based on "grave risk," pursuant to Article 13(b), and on "fundamental principles . . . relating to the protection of human rights and fundamental freedoms," pursuant to Article 20, must be established by clear and convincing evidence. *See* 42 U.S.C. § 11603(e)(2)(A) (respondent bears the burden of establishing "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies[.]"). In contrast, the remaining defenses (i.e., child is "settled," pursuant to Article 12; "plaintiff was not actually exercising custody rights," pursuant to Article 13(a); and child "objects," pursuant to Article 13) need only be established by a preponderance of evidence. *See* 42 U.S.C. § 11603(e)(2)(B) (respondent bears the burden of establishing "by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.").

but remanded because it believed that the Convention "require[d] a more complete analysis of the full panoply of arrangements that might allow the children to be returned ... in order to allow the courts of that nation an opportunity to adjudicate custody." *Blondin II*, 189 F.3d at 242. As it explained: "Courts considering Hague Convention petitions should make every effort to honor simultaneously the Convention's commitments (1) to the return of wrongfully abducted children to their home countries, and (2) to safeguarding the children from 'grave risk of harm.'" *Id.*[11]

Thus, the circuit court concluded that "it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation[,]" *id.* at 248, commenting that "[the children] could return to France in the temporary care of some other person; a court in that country would then be empowered—unlike the federal courts of the United States—to make plenary determinations regarding the children's long-term custody." *Id.*

Although the circuit court agreed with the district court that the children should not be returned to their father's custody, remand was necessary because the district

court did not explain its determination "that the children should not be returned in the temporary custody of some appropriate and suitable third party," *id.* at 249, even though the father had suggested that the children could be placed with "their godmother, pending a final adjudication of custody by the courts of France." *Id.* It commented that on remand the district court "will have the opportunity to exercise its broad equitable discretion to develop a thorough record to facilitate its decision," and in doing so,

> should feel free to make any appropriate or necessary inquiries of the government of France—especially regarding the availability of ameliorative placement options in France—and to do so, *inter alia*, by requesting the aid of the United States Department of State, which can communicate directly with that foreign government.

*Id.*[12] It emphasized, however, that it was not disturbing the district court's finding that returning the children to their father's custody would expose them to a "grave risk of harm"; therefore, "if the District Court remain[ed] unable to find any reasonable means of repatriation that would *not* effectively place the children in [the father's] immediate custody, it should deny [the father's] petition under the Convention." *Id.* at 250.

Although the circuit court supported the district court's grave-risk finding because

---

**11.** The court noted that "[t]he careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations—whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection." *Blondin II*, 189 F.3d at 242.

**12.** Sensitive to the deference to be accorded by the Convention to the child's home state, the circuit court, on its own initiative, had "asked the Department of State to contact the

government of France and, if possible, to submit to th[e] Court that government's position on the return of the children as well as on the availability of temporary care for them pending final adjudication of custody, in the event they should be returned." *Blondin II*, 189 F.3d at 244. Since it did not receive a concrete proposal from the French Government, which was "apparently still in the process of considering a temporary placement decision," it believed it best for the district court to pursue the matter on the remand.

"[a]mple record evidence supported [its] factual determination regarding the risk of physical abuse that the children would face upon return to [their father's] custody," *id.* at 247, it rejected the other, "ancillary," considerations articulated by the district court to support this finding—that the oldest child "expressed a preference to remain in the United States," and that "the children 'have settled in well' in this country." *Id.* at 248.

In respect to the child's preference, the circuit court reasoned that this was not part of the grave-risk exception; rather, it was one part of the Convention's separate provision allowing a court to take into account a child's objection to being returned if the court found that the child had obtained an age of sufficient maturity, and the district court did not make such a finding. *See id.* at 247.

In respect to the district court's reliance on the children being well-settled in the United States, the circuit court noted that this too was not part of the grave-risk exception, but was covered by the separate exception permitting such a consideration only if the parent seeking the child's return had waited more than one year before filing the petition, which, as in the present case, was not there the case; however, the circuit court did not rule out "the possibility of a case in which a petition seeking a child's return [was] filed less than a year after the child's abduction, but it [was] nevertheless established 'by clear and convincing evidence' on the child's behalf that he or she is so deeply rooted in the United States that 'there is a grave risk that [the child's] return would expose the child to ... psychological harm.'" *Id.* at 248. The record before the circuit court "d[id] not present such a case." *Id.*

On remand, the district court obtained the views of the French Government and also took testimony from a French attorney, whom the United States Department of State presented as an expert on French and international family law, and the court concluded "that France could protect the children from further abuse." *Blondin v. Dubois,* 78 F.Supp.2d 283 (S.D.N.Y.2000) (*Blondin III*). However, the court determined that it was unclear how long the French custody proceedings would take; moreover, the proceedings would "expose the children to extreme uncertainty about where they will live and who will take care of them, as well as the insecurity of having their fate decided by strangers[,]" and "[t]o some extent, [the children] would essentially become wards of the state, dependent on public assistance." *Id.* at 295–96.

Decisively, a widely recognized expert in child psychiatry and psychology testified that "removing the children from [their] secure environment to return them to France would 'almost certainly' trigger a recurrence of the traumatic stress disorder they suffered in France—i.e., a post-traumatic stress disorder," *id.* at 291, because of their father's physically and emotionally abusive treatment of the mother and oldest child, and that the children would consequently "suffer severe psychological harm from *any* return to France, no matter how carefully managed by the French courts." *Id.* at 298 (emphasis in original). The court concluded, therefore, that "[w]hat France could not do, if the children were returned, is protect them from the trauma of being separated from their home and family and returned to a place where they were seriously abused, amidst the uncertainties of court proceedings and being on public assistance[,]" *id.;* accordingly, it dismissed the petition.

In doing so, the court also took the oldest child's opposition to being returned to France into account, having found her to be of sufficient age and maturity to consider her views, *see id.* at 296, and

noted that the case was markedly different from those cases which declined to apply the grave-risk exception where "the abducting mother alleg[ed] nothing more than adjustment problems that would attend the relocation of most children," *id.* at 297 (internal citation omitted), because "[h]ere, the trauma of uprooting the children from their stable home [was] compounded and magnified by the fact that they [would] be returned to the country where they were severely abused physically and emotionally[ ] by their father for an extended period of time." *Id.*[13]

On further appeal to the Second Circuit, the petitioner challenged the district court's conclusion "that repatriation would create a grave risk of psychological harm within the meaning of Article 13(b)," and objected "to the District Court's consideration, as part of its 'grave risk' analysis, of whether the [the older child] is settled in her new environment and whether she objects to returning to France." *Blondin IV*, 238 F.3d at 158 The circuit court rejected these two objections since they were not the sole reasons for dismissing the petition, but simply "non-conclusive factors in [the district court's] broader 'grave risk' analysis under Article 13(b)." *Id.* at 168. Thus, the older child's testimony was "germane to the question of whether a grave risk of harm exist[ed] upon repatriation" because she did not want to return to France "to be subjected to further physical and emotional abuse at the hands of her father," *id.* at 167 (internal citation omitted), and there was a "connection between the fact that [the children] were settled and the grave risk of harm the [district court] had found a return to France would create" since the children's return "would thwart their recovery *by causing a recurrence of the traumatic stress disorder they suffered in France,* the site of their father's sustained, violent abuse." *Id.* at 165 (emphasis in original).

Since the circuit court determined that these two factors could properly be considered by the district court on the issue of repatriation, it found no basis to upset the district court's finding "that the children would face a recurrence of 'acute severe traumatic stress disorder' if they were repatriated to France," or the district court's application of Article 13(b) of the Convention to this finding "in reaching the legal conclusion that repatriation of the children would subject them to a 'grave risk of psychological harm.'" *Id.* at 168. In so holding, the circuit court, echoing the rationale of the district court, discounted all the arrangements the petitioner and the French government would be willing to make to facilitate repatriation of the children because "*even with all of these arrangements in place,*" the stress disorder they would experience on returning to France would be associated with France because of "their father's abuse and the trauma they suffered as a result." *Id.* at 161 (emphasis in original). As it explained: "[D]ue to the particular circumstances presented here, [the French authorities] cannot provide the necessary protection because doing so would require them to fulfill the impossible task of ensuring that a return to France would not trigger a recurrence of traumatic stress

---

**13.** The court cited to cases which, although finding that mere adjustment problems associated with separations from primary caretakers or family members could not be factored into a grave-risk determination, did not contain any allegations of abuse, *see Blondin III*, 78 F.Supp.2d at 297 (citing cases), noting that

"[b]y contrast, the likely recurrence of the children's traumatic stress disorder, caused by [their father's] abuse, that any return to France will trigger will surely result in long-term or permanent harm, and is not the typical adjustment problems that attends the usual Convention return." *Id.*

disorder in the children." *Id.* at 162.[14] The court further indicated that if this were not the case, a protective order would nonetheless be ineffective if it were found that it would likely be disobeyed. *See id.* (citing *Walsh,* 221 F.3d at 221, for its holding "that although the court had no doubt that [courts of the home country] would issue appropriate protective orders, repatriation was denied in part because spouse's habitual disobedience of such orders would render them ineffective" (internal quotations omitted)).

## B. Other Relevant Caselaw

Courts have recognized that a child's observation of spousal abuse is relevant to the grave-risk inquiry: "Spousal abuse ... is a factor [in the grave-risk inquiry] because of the potential that the abuser will also abuse the child." *Tsarbopoulos v. Tsarbopoulos,* 176 F.Supp.2d 1045, 1057–58 (E.D.Wash.2001). Quoting from *Walsh,* 221 F.3d at 220, *Tsarbopoulos* aptly explained:

> [C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers.... [B]oth state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser.... These factors are sufficient to make a threshold showing of exposure to physical or psychological harm.

*Tsarbopoulos,* 176 F.Supp.2d at 1058 (citations omitted).

A parent's general pattern of violence is also relevant. In *Walsh,* the First Circuit ruled that the district court committed a "fundamental error" when "it failed to credit [the father's] more generalized pattern of violence[,]" which included his "threat to kill his neighbor ..., for which he was criminally charged, and his fight with [another son]." *Walsh,* 221 F.3d at 220–21. The court explained: "First, [the father] has demonstrated an uncontrollably violent temper.... Second, [he] has demonstrated that his violence knows not the bonds between parent and child or husband and wife, which should restrain such behavior." *Id.* at 220.

## C. Application

■ Applying the teachings of *Blondin* and the other relevant caselaw, the Court concludes that its factual findings constitute clear and convincing evidence that warrant invocation of the Article 13(b) grave-risk exception.

### i. Ma'ayan and David

In regard to Ma'ayan and David, returning the children to their father's residence during the pendency of custody proceedings would surely expose them to a grave risk of both physical and psychological harm given the abject physical abuse they experienced when living with their father, their witnessing their father's abuse of their mother, as well as each other, and the uprooting from their well-settled environment in the United States to the country where they were physical and emotionally abused, coupled with the relapse they would suffer of their post-traumatic stress disorders and the likelihood that Ma'ayan would be suicidal.

Moreover, there are no alternative arrangements that could effectively mitigate the grave risk to Ma'ayan and David even if they did not live with their father. Living with their grandparents is not a viable option: Their maternal grandmother lives with her son in only two rooms; moreover,

---

**14.** Notably, the circuit court believed the case to be "unusual" in that "the only expert testimony in the record support[ed] the District Court's conclusions and judgment." *Blondin IV,* 238 F.3d at 168.

she resides only two minutes away from Mr. Elyashiv in Ramat Gan, within easy striking distance for him to continue his abuse. The maternal grandfather lives in the United States. As for the paternal grandparents, they have had no relationship with the children for many years; moreover, since they also live in Ramat Gan, Mr. Elyashiv would have easy access to them.[15] Finally, since Mr. Elyashiv admitted that he is "facing dire economic circumstances[,]" and his "house was taken away from him[,]" it is likely that other living arrangements would be difficult to come by, and the children could become wards of the state.

In any event, similar to *Blondin,* in light of the sole, unimpeached and uncontroverted testimony of Dr. Brandt that the *mere* return of the children to Israel would trigger their post-traumatic stress disorders, as well as Ma'ayan's suicidal ideations, the issue of whether there would be any living arrangements in Israel is irrelevant; for the same reason, there was no need for the Court to have reached out to the Israeli authorities for their input. In addition, "it is quite possible that [Mr Elyashiv] would refuse to comply with any orders limiting his contact with the children or directing him not to abuse them." Expert Report # 3 at 1.

### ii. Inbar

■ Even though Inbar has yet to be physically abused by her father, and is not suffering from post-traumatic stress disor-

der, returning her to Israel would also expose her to a grave risk of physical and psychological harm. In respect to physical harm, she is not insulated from the likelihood of future abuse, given Mr. Elyashiv's inability to control his temper, his pattern of domestic abuse and his threats to use the "small sword" to hurt her. As for psychological harm, since her siblings would remain in the United States and, presumably her mother as well, Dr. Brandt poignantly explained, as previously noted, that "[a] separation from her mother and siblings is a completely terrifying notion to [Inbar][,]" Expert Report # 1 at 8, and that Inbar's "greatest fear . . . is to be separated from her mother. . . ." Expert Report # 2 at 10.

As for alternative arrangements if Inbar were returned to Israel, she would be in the same situation as her siblings, other than that she has no manifestations of posttraumatic stress disorder, presumably because of her young age; however, under the circumstances of this case, especially in light of Dr. Brandt's report of Inbar's "terrifying notion" of being separated from her siblings and mother, the Court cannot find that there could be any viable arrangements that the Israeli authorities, or anyone else, could provide; moreover, once again, Mr. Elyashiv is not likely to obey any protective order.[16]

### CONCLUSION

In light of the Court's conclusion that the grave-risk exception under Article

---

15. Because of the close proximity of Mr. Elyashiv to his parents, it is not feasible, as counsel suggests, for him to live with his parents and for Ms. Elyashiv and the children to live in his home that he is renting. *See* Letter from Corinne Levy (July 23, 2004), at 8.

16. In *Blondin III,* the district court noted that the expert explained that the younger child, who was four, did not exhibit any "clear manifestations of traumatic stress-disorder

. . . because he would probably have been too young to remember it or be able to verbalize it." 78 F.Supp.2d at 291 n. 9. The court, nonetheless, commented that it "will not separate the children," *id.,* citing cases, including *Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1005–06 (N.D.Ill.1989) ("[C]hildren['s] relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State.'"

13(b) of the Convention applies, the petition is denied.[17]

**SO ORDERED.**

(quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984))). The court's decision, however, as well as the Second Circuit's affirmance, inexplicably proceeded on the basis that both children would experience post-traumatic stress disorder if returned to France. Under the unique facts of the present case, the Court need not grapple with the unpalatable prospect of having to determine whether suitable arrangements by governmental authorities could be arranged for some, but not all, siblings, requiring their separation.

17. Since the Court has determined that the grave-risk exception applies, the Court need not address the other affirmative defense raised by respondent—that the children, having attained a sufficient age and degree of maturity, object to their return.